**Unpublished Cases Cited In**
**Defendant's Memorandum In Support Of Its**
**<u>Motion To Dismiss For Lack Of Subject Matter Jurisdiction</u>**

*Circuit City Stores, Inc. v. Speedy Car-X, Inc.*, No. 3:94-CV-712, 1995 U.S. Dist. LEXIS 6515 (E.D. Va. Mar. 27, 1995) .......... 2

*Estate of Thermond v. Gallant Transport, Inc.*, No. 06-1041-GPM, 2007 U.S. Dist. LEXIS 49608 (S.D. Ill. July 10, 2007).......... 11

*HealthNet, Inc. v. Health Net, Inc.*, No. 2:01-0835, 2003 U.S. Dist. LEXIS 139 (S.D. W. Va. Jan. 7, 2003).......... 13

*Luma Corp. v. Stryker Corp.*, No. 1:02-1132, 2006 U.S. Dist. LEXIS 50836 (S.D. W. Va. July 24, 2006).......... 20

*Objective Interface Systems v. Garrett*, No. 1:06cv540, 2006 U.S. Dist. LEXIS 79722 (E.D. Va. Oct. 27, 2006) .......... 39

*Staffing Plus, Inc. v. Team Rehab Services, LLC*, No. 05-4242 (MLC), 2006 U.S. Dist. LEXIS 519 (D.N.J. Jan. 6, 2006) .......... 43

Dockets.Justia.com

LEXSEE

Cited
As of: Jul 27, 2007

**CIRCUIT CITY STORES, INC., et al., Plaintiffs, v. SPEEDY CAR-X, INC., Defendant.**

**Civil Action No. 3:94CV712**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA, RICHMOND DIVISION**

**1995 U.S. Dist. LEXIS 6515; 35 U.S.P.Q.2D (BNA) 1703**

**March 27, 1995, Decided**
**March 27, 1995, FILED**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, the owners and licensee of a service mark, brought suit against defendant service mark owner for declaratory and injunctive relief, after defendant notified plaintiffs that he was contemplating filing an opposition to plaintiffs' service mark registration, upon the claim that there was no likelihood of confusion between the marks.

**OVERVIEW:** Plaintiffs were the owners and licensees of service marks that used the name "CARMAX." The service marks were used by plaintiffs in connection with auto superstores involved primarily in the sales of automobiles. Defendant corporation owned repair and maintenance shop franchises and held a service mark for the name "CAR-X." Defendant expressed its concern that there was a likelihood of confusion between the marks and told plaintiffs it would likely file an opposition to plaintiff's registration. The court dismissed plaintiffs' subsequent suit for declaratory and injunctive relief that alleged no likelihood of confusion after court concluded that plaintiffs had failed to establish the presence of a case or controversy justifying the exercise of federal subject matter jurisdiction because plaintiffs were found to have had no reasonable belief that infringement litigation was imminent and because apprehension of drawn-out warfare in Patent and Trademark Office was an insufficient basis for declaratory judgment.

**OUTCOME:** The court dismissed plaintiffs' action without prejudice because plaintiffs failed to establish a case or controversy that would have justified the exercise of federal subject matter jurisdiction.

**CORE TERMS:** infringement, repair, apprehension, trademark, registration, trucks, actual controversy, notice, superstores, luggage, leasing, declaratory, negotiations, threatening, service marks, automotive, stylized, declaratory judgment, subject matter jurisdiction, course of conduct, expanding, abandon, phase, shock absorbers, exhaust, brake, exercise jurisdiction, future damages, time of trial, legal interests

**LexisNexis(R) Headnotes**

***Civil Procedure > Justiciability > Case or Controversy Requirements > Actual Disputes***
***Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview***
***Civil Procedure > Declaratory Judgment Actions > Federal Judgments > General Overview***
[HN1]The court can contemplate no substantive consideration of a declaratory judgment action until a plaintiff first demonstrates, by a preponderance of the evidence, that there is an actual controversy between the parties. 28 U.S.C.S. § 2201.

***Civil Procedure > Justiciability > Case or Controversy Requirements > Adverse Legal Interests***
***Civil Procedure > Justiciability > Case or Controversy Requirements > Immediacy***

***Criminal Law & Procedure > Search & Seizure > Search Warrants > Affirmations & Oaths > Sufficiency Challenges***
[HN2]When making a determination of whether an actual controversy between parties exists, a court must ask whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

***Civil Procedure > Justiciability > Case or Controversy Requirements > General Overview***
***Trademark Law > Infringement Actions > Jurisdiction > General Overview***
[HN3]A plaintiff may satisfy the 28 U.S.C.S. § 2201 actual controversy test by showing that he harbored a real and reasonable apprehension of trademark infringement litigation.

***Civil Procedure > Justiciability > Case or Controversy Requirements > General Overview***
***Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview***
***Copyright Law > Civil Infringement Actions > General Overview***
[HN4]A court must consider the totality of the circumstances when asking whether a plaintiff has satisfied the 28 U.S.C.S. § 2201 actual controversy test.

***Civil Procedure > Justiciability > Case or Controversy Requirements > Actual Disputes***
***Trademark Law > Federal Unfair Competition Law > General Overview***
***Trademark Law > Infringement Actions > Determinations***
[HN5]Even in the absence of direct charges of infringement against a plaintiff by a defendant, an actual controversy can be found if the commercial realities of the situation puts plaintiff in a position where it must run a risk of real liability if it goes ahead to exercise what it believes are its legal rights in the commercial market.

***Civil Procedure > Justiciability > Case or Controversy Requirements > Actual Disputes***
[HN6]A plaintiff must demonstrate a course of conduct that implies an imminent threat of impending legal action by a defendant in order to demonstrate a case or controversy. A reasonable apprehension alone, if not inspired by the defendant's actions, does not give rise to an actual controversy.

***Civil Procedure > Justiciability > Case or Controversy Requirements > General Overview***
***Trademark Law > U.S. Trademark Trial & Appeal Board Proceedings > Oppositions > General Overview***
[HN7]A party cannot claim to have acquired a reasonable apprehension of litigation merely because a defendant commenced an opposition proceeding in the Patent and Trademark Office.

***Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview***
[HN8]Federal courts are prohibited from preempting and prejudging issues that are committed for initial decision to an administrative body or special tribunal.

***Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview***
***Patent Law > U.S. Patent & Trademark Office Proceedings > Examinations > General Overview***
[HN9]A real and reasonable apprehension of drawn-out warfare in the trenches of the Patent and Trademark Office is an insufficient basis for a declaratory judgment.

***Civil Procedure > Justiciability > Case or Controversy Requirements > General Overview***
***Patent Law > Infringement Actions > Infringing Acts > General Overview***
[HN10]A defendant's infringement suit against unconnected third parties cannot support a reasonable fear of litigation against a plaintiff.

***Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview***
[HN11]Where no claim of infringement is made, and the only concrete dispute between parties relates to a registration proceeding in an administrative agency, the Declaratory Judgment Act should not be used to adjudicate trademark rights.

**COUNSEL:** [*1] For CIRCUIT CITY STORES, INC., CIRCUIT CITY STORES WEST COAST, INC., AMCE COMMERCIAL CORPORATION, plaintiffs: Frank Grey LaPrade, III, McGuire, Woods, Battle & Boothe, Richmond, VA. John Washington Burke, III, McGuire, Woods, Battle & Boothe, Richmond, VA. Gilbert E. Schill, McGuire, Woods, Battle & Boothe, Richmond, VA. Dana Johannes Finberg, McGuire Woods Battle & Boothe, Richmond, VA.

For SPEEDY CAR-X, INC., defendant: Stephen Patrick Demm, Hunton & Williams, Richmond, VA. Ray Vinton Hartwell, III, Hunton & Williams, Richmond, VA. Robert Noel Clinard, Hunton & Williams, Richmond, VA. Marc P. Seidler, Rudnick & Wolfe, Chicago, IL. Thomas A. Gilson, Rudnick & Wolfe, Chicago, IL.

**JUDGES:** James R. Spencer, UNITED STATES DISTRICT JUDGE

**OPINION BY:** James R. Spencer

**OPINION**

*AMENDED MEMORANDUM OPINION*

Plaintiffs Circuit City Stores, Inc. ("CCSI"), Circuit City Stores West Coast, Inc. ("CCSWC"), and Acme Commercial Corp. ("Acme"), seek declaratory and injunctive relief, claiming that there is no likelihood of confusion between their "CARMAX" service marks and the "CAR-X" service marks held by the defendant, Speedy Car-X, Inc. On January 17 and 18, 1995, this matter came before the Court for a bench trial. At the conclusion of the evidence, the Court took the matter under advisement and informed the parties that a decision would be forthcoming. After considerable study, and as set forth in greater detail below, the Court has concluded that the plaintiffs have failed in their attempts to establish the presence of a case or controversy justifying the exercise of federal subject matter jurisdiction. Accordingly, this matter will be DISMISSED WITHOUT PREJUDICE.

I.

The Court assumes familiarity with its Memorandum Opinion issued concurrent with the denial of the defendant's Motion to Dismiss. However, a recitation of the facts adduced at trial will highlight why the Court now reaches [*2] a different conclusion on the jurisdictional question.

CCSWC, a California corporation, owns seven service marks using the name "CARMAX." It licensed the use of these marks to its parent, CCSI, a Virginia corporation, which in turn licensed them to another wholly-owned subsidiary, Acme. Acme, also a Virginia corporation, now uses several of those marks at "CARMAX Auto Superstore" facilities it operates in Richmond, Virginia and Raleigh, North Carolina, and at an inventory reconditioning facility in Winter Haven, Florida. The superstores are primarily sales establishments, marketing used cars, minivans, vans, and trucks. However, Acme also provide routine maintenance, care, and repair services for automobiles, often on site but sometimes through outside vendors. Acme plans to open two new CARMAX facilities in the Atlanta area in the Spring of this year. In addition, the parties presented evidence at trial of the potential growth of the CARMAX "test."

In 1994, CCSWC filed seven applications with the Patent and Trademark Office (PTO), seeking to register the following marks for future use:

| Mark | Serial No. | Services |
|---|---|---|
| CARMAX | 74/405,483 | Leasing of automobiles and trucks |
| | | |
| CARMAX | 74/413,398 | Repair and maintenance of automobiles and trucks |
| | | |
| CARMAX | 74/801,650 | Retail sale of automobiles and trucks |
| | | |
| CARMAX THE AUTO SUPERSTORE | 74,518,323 | Repair and maintanance of automobiles and trucks; sale of automobiles and trucks |
| | | |
| CARMAX THE AUTO SUPERSTORE | 74/518,176 | Leasing of automobiles and trucks |
| | | |
| CARMAX THE AUTO SUPERSTORE (stylized) | 74/520,002 | Repair and maintenance of automobiles and trucks; sale of automobiles and trucks |
| | | |
| CARMAX THE AUTO SUPERSTORE (stylized) | 74/520,002 | Leasing of automobiles and trucks |

[*3] It later amended the four "sale and repair" applications to "use based" status to reflect the opening of the CARMAX Superstore. All of these applications are pending before the PTO, which has already declared that the '398, '176, '323, '002, and '003 marks appear to be entitled to registration. The '398 mark was published in the PTO's *Official Gazette* on February 15, 1994. The other four marks at issue here were published during the pendency of this litigation. [1]

1 The plaintiffs have recently filed six additional applications to register other CARMAX marks for other goods and services. These marks and applications are not at issue in this litigation.

Defendant Speedy Car-X, Inc. ("Speedy") is a Delaware corporation headquartered in Chicago, Illinois. Speedy owns or franchises over 150 repair and maintenance shops, located exclusively in the Midwestern United States, with the exception of one franchise in North Palm Beach, Florida. Speedy licenses three registered trademarks and trade names to its [*4] franchisees. Those marks are:

| Mark | Reg. No. | Services |
| --- | --- | --- |
| CAR-X (stylized) | 995,481 | automotive services comprising installation and repair of automotive exhaust systems, brakes and shock absorbers |
| | | |
| CAR-X | 1,003,042 | automotive services comprising installation and repair of automotive exhaust systems, brakes and shock absorbers |
| | | |
| CAR-X CARES (stylized) | 1,444,476 | motor vehicle repair services |

After the PTO published the CARMAX '398 mark, Speedy became troubled by an alleged likelihood of confusion with the CAR-X marks. Thus, it requested that the PTO grant it an extension of time in which to file a Notice of Opposition to the registration of the '398 mark. The time for filing such a Notice was subsequently extended to September 9, 1994.

Speedy also aired its concerns directly with the plaintiffs, orally demanding that Acme "phase out" further use of all of its CARMAX marks and "abandon" its service mark applications. Speedy's trademark lawyer repeated these demands in a May 17, 1994, letter to the plaintiffs' attorneys. That letter confirmed that Speedy had

> concluded that there is a likelihood of confusion between its registered trademark and trade [*5] name CAR-X (and CARx) and [the plaintiffs'] use of the mark CARMAX for the repair and maintenance of automobiles and trucks, and for the sale and leasing of automobiles and trucks. Accordingly, we have been instructed to prepare and file notices of opposition, if necessary. Nevertheless, we would hope that this matter can be amicably resolved by having your client agree to phase out its use of the mark and abandon its trademark application. We look forward to hearing further from you as to whether this will be possible.

At trial, Speedy's in-house counsel, Martin Ciotti, termed this letter "a preliminary contact" and just "a lawyer's first letter." Regardless, the communication evidently had a greater effect on the plaintiffs. Acme General Manager Mark F. O'Neil testified that he "felt threatened and concerned" after reading the letter. He didn't understand what the nature of the problem because, as he put it, "CAR-X doesn't sound like CARMAX to me."

Although the two sides thereafter entered into negotiations aimed at settling the dispute, these discussion proved fruitless. Speedy filed its Notice of Opposition to the registration of the '398 mark on September 9, 1994, citing [*6] its belief that the marks are "confusingly similar." In addition, Speedy filed requests for extension of time in which to oppose registration of the plaintiffs' '323, '002, and '003 marks, which relate to "repair and maintenance."

At some point after Speedy first notified the plaintiffs of its concerns, they learned of a 1975 PTO opposition proceeding in which Speedy challenged the proposed registration of several marks owned by Exxon Corporation. Informed that these were "lengthy and arduous proceedings," CCSI Chairman Richard Sharp re-

solved to settle the CAR-X dispute in the courts. Accordingly, the plaintiffs filed the instant action on September 21, 1994. Speedy interposed a motion to dismiss one month later, which this Court denied.

By the time of trial, Speedy had narrowed its objections, opposing only the registration of CARMAX marks for automobile repair and maintenance. Speedy's fear, apparently, is the possibility that the plaintiffs might one day establish stand-alone repair facilities under the CARMAX name. While he acknowledged that Speedy has never explicitly repudiated or withdrawn the May 17 letter, Ciotti testified that, given the chance, he "would withdraw the sale [*7] and leasing part of the letter today," and declared that there was never a threat of infringement litigation. According to him, "no David versus Goliath action is anticipated."

II.

[HN1]The Court can contemplate no substantive consideration of this declaratory judgment action until the plaintiffs first demonstrate, by a preponderance of the evidence, that there is an "actual controversy" between the parties. 28 U.S.C. § 2201 (West 1994). [HN2]When making this determination, this Court must ask

> whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

*Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S. Ct. 510, 512, 85 L. Ed. 826 (1941) (citation omitted). Under the rule applied by this Court when considering Speedy's Motion to Dismiss, [HN3]the plaintiffs may satisfy this test by showing that they harbored a "real and reasonable apprehension" of trademark infringement litigation. *See Jeffrey Banks, Ltd. v. Jos. A. Bank Clothiers, Inc.,* 619 F. Supp. 998, 1002 (D. Md. 1985). [*8]

Speedy now urges the Court to apply a two-part test crafted by the Federal Circuit. Under that approach, it would not be enough that the plaintiffs reasonably anticipated litigation; they must also have engaged in a course of conduct that brought themselves into adversarial conflict with the defendant. *Windsurfing Intern., Inc. v. AMF, Inc.,* 828 F.2d 755, 757 (Fed.Cir. 1987); *Indium Corp. of America v. Semi-Alloys, Inc.* 781 F.2d 879, 883 (Fed.Cir. 1985), *cert. denied,* 479 U.S. 820, 107 S. Ct. 84, 93 L. Ed. 2d 37 (1986). Indeed, the Maryland District, which invoked the one-factor inquiry in *Jeffrey Banks,* later adopted the *Windsurfing* analysis in *Baltimore Luggage Co. v. Samsonite Corp.,* 727 F. Supp. 202 (D. Md. 1989). [2] Nevertheless, the Court's application of the *Jeffrey Banks* one-factor test is now the law of the case; it would be improper and inequitable to switch rafts mid-stream. Therefore, the Court will concentrate on the "reasonable apprehension" standard.

> 2 Applying that test, the court held that an actual controversy could not arise from the mere possibility of future conflict.
>
> > Although Baltimore Luggage at one time engaged in conduct which brought it into conflict with Samsonite, it ceased that course of conduct. The controversy between [the parties] is now only a theoretical one: Baltimore Luggage fears that Samsonite will again assert its trademark rights *if* Baltimore imports Starfrost luggage or similar luggage in the future. Because there is no present conduct producing an actual conflict between [the parties], the second prong of the test is not satisfied. Baltimore Luggage's fear that Samsonite will sue in the future is not, in and of itself, sufficient to establish a case of controversy.
>
> 727 F. Supp. at 210 (emphasis in original).

[HN4]

[*9] The Court must consider the totality of the circumstances when asking whether the plaintiffs have satisfied this test. *Arrowhead Industr. Water, Inc. v. Ecolochem, Inc.,* 846 F.2d 731, 736 (Fed.Cir. 1988). When scouring the trial record, the Court looks for conduct that is "directed toward the plaintiff[s]." *Texas v. West Pub. Co.,* 882 F.2d 171, 177 (5th Cir. 1989) (applying test in copyright infringement context), *cert. denied,* 493 U.S. 1058, 110 S. Ct. 869, 107 L. Ed. 2d 953 (1990). The "traditional legal indicia of [a] 'reasonable apprehension' [are] positive or threatening language in contacts initiated by the defendant, or a background of litigation between the parties." *Crown Drug Co. v. Revlon, Inc.,* 703 F.2d 240, 244 (7th Cir. 1983).

While such direct experience is forceful evidence indeed, a reasonable apprehension may arise indirectly. *West Pub. Co.,* 882 F.2d at 177. In the words of one authority, the

> threat of infringement does not have to be said in so many words. It can be expressed in the attitude of the defendant as expressed in "circumspect language" in a letter. [HN5]Even in the absence of direct charges of infringement against plaintiff [*10] by defendant, an 'actual controversy' can be found if the commercial realities of the situation puts plaintiff in a position where it must run a risk of real liability if it goes ahead to exercise what it believes are its legal rights in the commercial market.

4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 32.18[1], at 32-67 (3d ed. 1994) (footnotes omitted). In either event, however, [HN6]the plaintiff must demonstrate "a course of conduct that implies an '*imminent* threat of impending legal action' by the defendant. *West Pub. Co.,* 882 F.2d at 176 (emphasis added) (quoting *Goodyear Tire & Rubber, Inc. v. Releasomers, Inc.,* 824 F.2d 953, 956 (Fed.Cir. 1987). "A reasonable apprehension alone, if not inspired by defendant's actions, does not give rise to an actual controversy." *International Harvester Co. v. Deere & Co.,* 623 F.2d 1207, 1211 (7th Cir. 1980).

If there is a polestar to this inquiry, it is that [HN7]a party cannot claim to have acquired a reasonable apprehension of litigation merely because the defendant commenced an opposition proceeding in the Patent and Trademark Office. *Topp-Cola Co. v. Coca-Cola Co.,* 314 F.2d 124, 125-26 [*11] (2d Cir. 1963); *Merrick v. Sharp & Dohme, Inc.,* 185 F.2d 713, 717-718 (7th Cir.), *cert. denied,* 340 U.S. 954, 71 S. Ct. 573, 95 L. Ed. 687 (1951); *American Brahmental Ass'n v. American Simmental Ass'n,* 443 F. Supp. 163, 165 (W.D. Tex. 1977); *Red Lobster Inns of America, Inc. v. New England Oyster House, Inc.,* 378 F. Supp. 1144 (S.D. Fla. 1974), *aff'd,* 524 F.2d 968 (5th Cir. 1975); *Acme Feed Mills, Inc. v. Quaker Oats Co.,* 313 F. Supp. 1156, 1158 (M.D.N.C. 1970). [HN8]Federal courts are thus prohibited from "preempt[ing] and prejudging issues that are committed for initial decision to an administrative body or special tribunal." *Public Service Comm'n v. Wycoff Co.,* 344 U.S. 237, 246, 73 S. Ct. 236, 241, 97 L. Ed. 291 (1952). Put another way, this Court should strive "not to short-circuit the administrative tribunal that has already achieved jurisdiction over the issues." McCarthy, *supra,* § 32.18[2], at 32-69-70. Still, in proper circumstances, the filing of a notice of opposition can ram home the point that the declaratory defendant means business. *See Manufacturers Hanover Corp. v. Maine Sav. Bank,* No. 84 Civ. 2046 (JFK), 1985 WL 181, at *2 (S.D.N.Y. [*12] Jan. 10, 1985).

In *Chesebrough-Pond's, Inc. v. Faberge, Inc.,* 666 F.2d 393 (9th Cir.), *cert. denied,* 459 U.S. 967, 103 S. Ct. 294, 74 L. Ed. 2d 277 (1982), the Ninth Circuit found an actual controversy where the defendant preceded opposition proceedings with a letter to Chesebrough "stating that it believed the two marks to be 'confusingly similar,' and warning Chesebrough that unless it withdrew its application, Faberge would file opposition thereto." *Id.* at 395. The Court held that by incorporating the "likelihood of confusion" standard relevant to both registration and infringement proceedings, the letter supported a reasonable inference that Faberge was threatening an infringement action. *Id.* at 396-97. To hold otherwise would ignore economic realities:

> failure . . . to resolve the dispute would force Chesebrough to choose between continuing to forego competition in this quickly expanding market, and entering the market, risking substantial future damages and harm to relationships with its customers and retailers.

*Id.* at 397.

The *Manufacturers Hanover* court reached a similar conclusion. That case featured a letter in which the defendant [*13] informed the plaintiff of its concerns that the parties' marks were likely to be confused. Although it expressed a desire to pursue a negotiated settlement, the defendant assured the plaintiff that its "'aggressive' [trademark] policy . . . occasionally required the initiation of formal legal proceedings." 1985 WL 181 at *2. The Court held that this could "surely be construed as a threat to institute an infringement action." *Id.* Further, the court held that while filing a notice of opposition does not alone create a reasonable apprehension of a lawsuit, it is probative evidence of an intent to sue. *Id.*

Finally, in *Jeffrey Banks,* the defendant sent a letter accusing the plaintiff of violating its rights under the Lanham Act and demanded that it cease and desist its continued use of the challenged mark. The defendant then filed a notice of opposition. After negotiating in vain, the plaintiff sued for a declaration of its rights. Finding that the breakdown in negotiations resurrected the threatening shadow of the . . . letter, made more ominous by the notice of opposition," the court found an actual controversy. 619 F. Supp. at 1002.

In its Memorandum Opinion denying Speedy's [*14] Motion to Dismiss, this Court held that the plaintiffs had alleged a reasonable apprehension of litigation. The Court noted that the May 17 letter mentioned a "likelihood of confusion," the standard in both infringement and opposition proceedings, and demanded that the

plaintiffs "phase out" their current use of the CARMAX name and "abandon" their pending applications. To the Court, it appeared that

> the threatening tone of the correspondence was revived and made clear by the failed negotiations and commencement of the opposition proceeding, which indicated that Speedy was rigid in defending its position.

Memo. Op. at 10 (footnote omitted). The Court also gave weight to the plaintiffs' allegations that Acme was already using the CARMAX name in its operations:

> Dismissing this action during its nascent stages would force the plaintiffs to choose between defending the name before the PTO and continuing its planned expansion of the CARMAX business.

Memo. Op. at 11 (citing *Chesebrough-Pond's,* 666 F.2d at 397). Now is the time to decide whether these allegations, and the inferences to be drawn thereon, constitute a reasonable apprehension of litigation.

[*15] III.

The plaintiffs' position must rise or fall on three things: the May 17 letter from Speedy's counsel, the failure of settlement negotiations, and the circumstances surrounding these events. [3] It is the Court's opinion that these facts, at most, gave the plaintiffs [HN9]a real and reasonable apprehension of drawn-out warfare in the trenches of the PTO. That, of course, is an insufficient basis for a declaratory judgment. *Topp-Cola Co.,* 314 F.2d at 125-26.

> 3 The plaintiffs cannot rely upon their knowledge that Speedy was involved in an opposition proceeding with Exxon in 1975. [HN10]The defendant's infringement suits against unconnected third parties cannot support a reasonable fear of litigation against the plaintiffs. *See West Pub. Co.,* 882 F.2d at 176; *Indium Corp.,* 781 F.2d at 883.

The Court stands by its initial reading of the "threat letter" and the effect of the negotiating stalemate upon the plaintiffs. The testimony of Acme's General Manager, O'Neil, made clear the intimidating thrust of this [*16] letter, citing the "threatened and concerned" feeling it inspired. That Speedy may never have intended to sue the plaintiffs for infringement is not the issue. What the sender may construe as a "lawyer's first letter" can have a markedly different, and entirely reasonable, effect on the recipient. [4]

> 4 At trial, the plaintiffs attempted to make hay of the fact that this letter was never withdrawn, a point to which the Court assigns far less significance. The relevant inquiry is whether the plaintiffs held a reasonable apprehension of litigation at the time the case was filed, not at the time of trial. *Trippe Mfg. Co. v. American Power Conserv. Corp.,* 46 F.3d 624, 1995 WL 27665 (7th Cir. Jan. 25, 1995) (citing *Ecolochem, Inc.,* 846 F.2d at 736). For the same reason, it is irrelevant that Speedy would now take back part of the letter.

What has become clearer since the time of the Motion to Dismiss is that Speedy's threatened opposition to the registration of the CARMAX marks did not place the plaintiffs [*17] in quite so severe a situation as the Court was once willing to believe. In *Chesebrough,* a major foundation for this Court's earlier decision, the parties were engaged in precisely the same industry. The Ninth Circuit noted:

> The market for men's cosmetics is expanding and highly competitive. The practical effect of the attenuated opposition proceeding before the Patent and Trademark Office was to allowed expanded marketing of the [defendant's] "Macho" line while chilling Chesebrough's efforts to market "Match" products . . . Failure to resolve the dispute would force Chesebrough to choose between continuing to forego competition in this quickly expanding market, and entering the market, risking substantial future damages and harm to relationships with its customers and retailers.

666 F.2d at 397. Because Chesebrough was placed in an obvious no-win situation, the court held that the plaintiff had a real and reasonable apprehension of impending litigation. *Id.*

The antithesis of that scenario appeared in *Goya Foods, Inc. v. Tropicana Products, Inc.,* 666 F. Supp. 585 (S.D.N.Y. 1987), *rev'd on other grounds,* 846 F.2d 848 (2d Cir. 1988). There, the declaratory [*18] plaintiff continued to use its marks in commerce, despite the institution of opposition proceedings in the PTO. *Id.* at 589. Citing this absence of "chill," the court commented

> The plaintiff is not in the position of one who does not know when or where the blow will fall. The present dispute regards only trademark registration, and might never give rise to a claim of infringement by defendant. The dispute between the parties is firmly in place before the agency, and may be entirely resolved there.

*Id.* Thus, the Court declined to exercise jurisdiction. [5]

> 5 The Second Circuit reversed the court's subsequent refusal to permit the plaintiff to amend its complaint to plead specific facts alleging an actual controversy. 846 F.2d at 854. That is of little consequence here, where the parties, despite the complexity of this case, have admirably marshalled a complete factual record in remarkably short period of time.

In this case, it is readily apparent that the parties currently do not compete [*19] in the service and repair industry. In truth, there is no evidence to suggest that the parties presently compete in *similar* industries within a similar geographic region. And it is entirely speculative whether they ever will during the current decade. Through its CAR-X shops, Speedy repairs and replaces mufflers, exhaust systems, shock absorbers, ride control products, brake systems, and also performs such services as oil changes. Speedy neither sells or leases automobiles, be they new or "previously owned", nor does it nurse any inclination to enter this market under the CAR-X names and marks. Finally, the Court opines that the plaintiffs' fledgling repair and service operations would pose little threat to Speedy's business even if the parties competed in the same geographic areas.

Having had the benefit of trial, the Court finds that the present case is more akin to *Goya Foods* than to *Chesebrough.* Speedy's challenge to the registration of the CARMAX marks has not dissuaded the plaintiffs from continuing to develop and implement aggressive expansion plans. Thus, unlike Chesebrough, the plaintiffs are not thrust between the Scylla of infringement liability and the Charybdis [*20] of failing to expand what might prove to be an enormously profitable venture. The plaintiffs' ongoing use of the CARMAX marks notwithstanding, they cannot reasonably have believed that *infringement litigation* was imminent. In the words of the *Goya Foods* court:

> [HN11]Where no claim of infringement is made, and the only concrete dispute between the parties relates to a registration proceeding in an administrative agency, the Declaratory Judgment Act should not be used to adjudicate trademark rights. The preferable course is to allow the agency to resolve the issue of registration properly before it.

666 F. Supp. at 588 (citations omitted).

Consequently, the Court finds that the assumption bolstering the exercise of federal subject matter jurisdiction has been proven false. Because the true state of the parties' business endeavors undermines the soundness of the Court's early jurisdictional finding that the plaintiffs had alleged a reasonable apprehension of infringement litigation, this matter will be dismissed. However, because a dismissal for such defects is not a judgment on the merits, the plaintiffs' claims are dismissed without prejudice. *See Hitt v. City of* [*21] *Pasadena,* 561 F.2d 606, 608 (5th Cir. 1977); *FDIC v. James J. Madden, Inc.,* 847 F. Supp. 374, 375 (D. Md. 1994). [6]

> 6 And, there being no actual controversy over which the court can exercise jurisdiction, the plaintiffs' claim for injunctive must likewise fall. They have not demonstrated that "a substantial controversy exists, between parties having adverse legal interests, of sufficient immediacy and reality to warrant adjudication." *Lake Carriers' Ass'n v. MacMullan,* 406 U.S. 498, 506, 92 S. Ct. 1749, 1755, 32 L. Ed. 2d 257 (1972).

IV.

For the reasons stated, the Court finds that the plaintiffs are unable to show the presence of a case or controversy that would justify the exercise of federal subject matter jurisdiction. To the contrary, this case "smacks too much of the hypothetical and contingent," *Windsurfing Intern.,* 828 F.2d at 758, and must be dismissed.

An appropriate Final Order shall issue.

James R. Spencer

UNITED STATES DISTRICT JUDGE

Date: MAR 27 1995

***AMENDED FINAL*** [*22] ***ORDER***

THIS MATTER is before the Court after the conclusion of a bench trial. On its own motion, the Court hereby VACATES its Final Order and Memorandum Opinion and ORDERS the Clerk to place those filings UNDER SEAL.

1995 U.S. Dist. LEXIS 6515, *; 35 U.S.P.Q.2D (BNA) 1703

The Court now issues the accompanying Amended Memorandum Opinion. For the reasons set forth in that Opinion, this case is hereby DISMISSED WITHOUT PREJUDICE.

And it is SO ORDERED.

James R. Spencer

UNITED STATES DISTRICT JUDGE

Date: MAR 27 1995

Page 10

LEXSEE

**ESTATE OF ODELIA THERMOND, By Pam Goedde, her Personal Representative, Plaintiff, vs. GALLANT TRANSPORT, INC., PENSKE TRUCK LEASING CORPORATION, and KEVIN D. MOHR, Defendants.**

**CIVIL NO. 06-1041-GPM**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF ILLINOIS**

**2007 U.S. Dist. LEXIS 49608**

**July 10, 2007, Decided**
**July 10, 2007, Filed**

**CORE TERMS:** matter jurisdiction, citizenship, decedent, invoke, exclusive of interest, jurisdictional, diversity, residency

**COUNSEL:** [*1] For Estate of Odelia Thermond, Pam Goedde, as personal representative of the estate of Odelia Thermond, Jeff Thermond, Plaintiffs: Jeffrey W. Ahlers, LEAD ATTORNEY, Kahn, Dees et al., Generally Admitted, Evansville, IN.

For Gallant Transport, Inc., Kevin D. Mohr, Defendants, Cross Claimants: Mark D. Bauman, LEAD ATTORNEY, Hinshaw & Culbertson - Belleville, Belleville, IL.

For Penske Truck Leasing Corporation, Defendant, Cross Defendant: Paul T. Fulkerson, Skiles DeTrude, Indianapolis, IN.

**JUDGES:** G. Patrick Murphy, Chief United States District Judge.

**OPINION BY:** G. Patrick Murphy

**OPINION**

**MEMORANDUM AND ORDER**

**MURPHY, Chief District Judge:**

This case was recently assigned to the undersigned district judge. A review of the amended complaint (Doc. 5) raises some jurisdictional concerns which must be immediately addressed. The Seventh Circuit repeatedly warns litigants and district courts that subject matter jurisdiction is not an issue to be taken lightly. *See, e.g., Belleville Catering Co. v. Champaign Market Place, L.L.C.,* 350 F.3d 691, 692 (7th Cir. 2003) ("[o]nce again litigants' insouciance toward the requirements of federal jurisdiction has caused a waste of time and money").

In this case, Plaintiff seeks wrongful death [*2] damages on behalf of her mother, a decedent, arising out of a vehicle/tractor-trailer collision which occurred in Lawrence County, Illinois. Plaintiff seeks to invoke the Court's jurisdiction on the basis of diversity of citizenship, pursuant to 28 U.S.C. § 1332. In order for this Court to have diversity jurisdiction under 28 U.S.C. § 1332, the parties must be of diverse citizenship and the amount in controversy must exceed the sum or value of $ 75,000, exclusive of interest and costs. [1]

1 Plaintiff prays for unspecified damages "in an amount that will fairly and adequately compensate them for their losses and damages" (*See* Doc. 5, p. 5-8) In light of the fact that the case involves an alleged wrongful death, the Court accepts this prayer, because it does not appear to a legal certainty that the claims are really for less than the jurisdictional minimum ($ 75,000, exclusive of interest and costs). *See Smith v. American General Life and Accident Ins. Co.,* 337 F.3d 888, 892 (7th Cir. 2003) (quoting *St. Paul Mercury Indem. Co. v. Red Cab Co.,* 303 U.S. 283, 289, 58 S. Ct. 586, 82 L. Ed. 845 (1938)).

"[T]he legal [*3] representative of the estate of a decedent shall be deemed to be a citizen only of the same State as the decedent." *See* 28 U.S.C. § 1332(c)(2). Thus, only the citizenship of Odelia Thermond, the deceased, matters for purposes of determining jurisdiction. Unfortunately, however, the complaint only alleges the *residency* of Pam Goedde, the Personal Representative. Because federal courts have jurisdiction over citizens of different states, a complaint must allege the *citizenship* of each party, not the residence. *Held v. Held,* 137 F.3d 998

(7th Cir. 1998); *Pollution Control Indus. of Am., Inc. v. Van Gundy,* 21 F.3d 152, 155 (7th Cir. 1994). The Seventh Circuit has repeatedly warned that an allegation of residency is insufficient to invoke federal subject matter jurisdiction. *See, e.g., Tylka v. Gerber Prods. Co.,* 211 F.3d 445, 448 (7th Cir. 2000). Plaintiff must allege the *citizenship* of the *decedent,* Odelia Thermond.

Finally, the Court also notes that the complaint merely alleges "[u]pon information and belief, Defendant, Kevin D. Mohr ("Mohr"), is a resident of Michigan with a home address of 79 Vevay Drive South, Mason, Michigan 48854." (*See* Doc. 5, para. 12). Again, the Court must know [*4] the *citizenship* of Mohr, *i.e.* his domicile; where he *resides* is immaterial to the issue of federal subject matter jurisdiction. Moreover, an allegation based upon "information and belief" is insufficient to invoke this Court's jurisdiction. *See America's Best Inns, Inc v. Best Inns of Abilene, L.P..,* 980 F.2d 1072, 1074 (7th Cir. 1992).

"[S]ubject matter jurisdiction must be a matter of certainty and not of probabilities," *Murphy v. Schering Corporation,* 878 F. Supp. 124, 125-26 (N.D. Ill. 1995),

and, at this time, the Court is not satisfied that jurisdiction exists. *See Tylka v. Gerber Prods. Co.,* 211 F.3d 445, 447 (7th Cir. 2000) (noting that federal courts are obligated to inquire *sua sponte* whenever a doubt arises as to the existence of federal jurisdiction). "[W]hile a court must dismiss a case over which it has no jurisdiction when a fatal defect appears, leave to amend defective allegations of subject matter jurisdiction should be freely given." *Leaf v. Supreme Court of Wis.,* 979 F.2d 589, 595 (7th Cir. 1992). Accordingly, pursuant to 28 U.S.C. § 1653, Plaintiff shall, on or before **August 1, 2007,** file a second amended complaint that properly invokes the Court's subject matter [*5] jurisdiction. Failure to do so will result in the dismissal of this action for lack of subject matter jurisdiction.

**IT IS SO ORDERED.**

DATED: 07/10/07

s/ *G. Patrick Murphy*

Chief United States District Judge

LEXSEE

Analysis
As of: Jul 27, 2007

**HEALTHNET, INC., Plaintiff, v. HEALTH NET, INC., Defendant.**

**CIVIL ACTION NO. 2:01-0835**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA, CHARLESTON DIVISION**

**2003 U.S. Dist. LEXIS 139**

**January 7, 2003, Decided**

**NOTICE:** [*1] NOT INTENDED FOR PUBLICATION IN PRINT

**SUBSEQUENT HISTORY:** Motion granted by Healthnet, Inc. v. Health Net, 2003 U.S. Dist. LEXIS 19708 (S.D. W. Va., Nov. 5, 2003)

**DISPOSITION:** Defendant's motion for summary judgment denied and plaintiff's cross-motion for summary judgment denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff ambulance company sought a declaratory judgment against defendant health corporation that the use of a mark was not likely to cause confusion and did not constitute trademark infringement. The corporation counterclaimed alleging trademark infringement, false designation of origin, and false impression of association. The parties cross-moved for summary judgment. The company moved for oral argument.

**OVERVIEW:** The corporation provided healthcare, healthcare administration, and health maintenance organization services, with subsidiaries in seven states. The corporation was traded on the New York Stock Exchange and had a website that provided information about the company. The corporation's predecessor-in-interest obtained a federally registered trademark for the mark, which was still in force and incontestable during this action. The company, not located in one of the subsidiary states, used the mark as a trademark and trade name in its home state and several others since it began operations. There was only one state that overlapped for both parties. The corporation sent two cease and desist letters to the company advising it that the use of the company's mark for air ambulance services was likely to cause confusion with the corporation's federally registered trademark. The court found that the company's declaratory judgment action presented a justiciable case or controversy because based on the letters, it was reasonable to assume that litigation was pending. There was a material question of fact as to whether there was a likelihood of confusion between the two marks.

**OUTCOME:** The corporation's motion for summary judgment was denied. The company's cross-motion for summary judgment was denied. The company's motion for oral argument on the cross-motions was denied as moot.

**CORE TERMS:** healthnet, summary judgment, declaratory judgment, cross-motion, trademark infringement, unfair competition, nonmoving party, infringement, counterclaim, registration, trademark, variation, declaratory relief, likely to cause, similarity, confusingly, cease, www, oral argument, justiciable case, case presents, material fact, continued use, actual controversy, cease-and-desist, incontestible, apprehension, declaratory, registered, responded

**LexisNexis(R) Headnotes**

***Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview***
***Civil Procedure > Summary Judgment > Standards > Genuine Disputes***

***Civil Procedure > Summary Judgment > Standards > Materiality***

[HN1]To obtain summary judgment, a moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, a district court will not weigh the evidence and determine the truth of the matter. Instead, the court will draw any permissible inference from the underlying facts in the light most favorable to a nonmoving party.

***Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants***
***Civil Procedure > Summary Judgment > Standards > Appropriateness***
***Evidence > Procedural Considerations > Burdens of Proof > General Overview***

[HN2]In the context of a summary judgment motion, although a district court will view all underlying facts and inferences in the light most favorable to a nonmoving party, the nonmoving party nonetheless must offer some concrete evidence from which a reasonable juror can return a verdict in his or her favor. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. The nonmoving party must satisfy this burden of proof by offering more than a mere scintilla of evidence in support of his or her position.

***Civil Procedure > Declaratory Judgment Actions > Federal Judgments > General Overview***
***Constitutional Law > The Judiciary > Case or Controversy > General Overview***

[HN3]A claim for declaratory judgment, like any other claim, must present a justiciable case or controversy within the meaning of U.S. Const. art. III. 28 U.S.C.S. § 2201(a). The two pronged test for determining whether a case or controversy exists in a declaratory judgment action for trademarks requires a showing that (1) the declaratory claimant has a real and reasonable apprehension of litigation, and (2) the claimant has engaged in a course of conduct which brought it into adversarial conflict with the declaratory defendant.

***Civil Procedure > Justiciability > Case or Controversy Requirements > Adverse Legal Interests***
***Civil Procedure > Justiciability > Case or Controversy Requirements > Immediacy***
***Civil Procedure > Declaratory Judgment Actions > Federal Judgments > General Overview***

[HN4]The second prong of the declaratory judgment action for trademarks test requires a district court to determine whether a plaintiff's conduct has brought it into actual controversy with a defendant. In other words, the question is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

***Trademark Law > Infringement Actions > Burdens of Proof***
***Trademark Law > Infringement Actions > Determinations***

[HN5]In a trademark infringement action, a plaintiff must show: (1) that its mark is valid and protected and (2) that a defendant's use of the contested mark is likely to cause confusion concerning the origin of the goods or services.

***Trademark Law > Infringement Actions > General Overview***
***Trademark Law > Protection of Rights > Registration > Evidence***
***Trademark Law > Protection of Rights > Registration > Incontestability > General Overview***

[HN6]In the context of a trademark infringement claim, where a mark is incontestable, its validity is conclusively presumed. 15 U.S.C.S. § 1115(b).

***Trademark Law > Likelihood of Confusion > Consumer Confusion > Circuit Court Factors > 4th Circuit Court***
***Trademark Law > Likelihood of Confusion > Similarity > Appearance, Meaning & Sound > General Overview***

[HN7]A seven-factor test is used in assessing whether a likelihood of confusion exists: (1) the strength and distinctiveness of the mark; (2) the similarity of the two marks; (3) the similarity of the goods and services that the marks identify; (4) the similarity of the facilities that the two parties use in their businesses; (5) the similarity of the advertising used by the two parties; (6) intent; and (7) actual confusion. The seventh factor, actual confusion, is often paramount because when a plaintiff's mark is strong and a defendant's use of a similar mark has actually confused the public, a district court's inquiry ends almost as soon as it begins.

***Trademark Law > Infringement Actions > General Overview***
***Trademark Law > Likelihood of Confusion > Consumer Confusion > General Overview***
[HN8]In the context of a trademark infringement claim, the likelihood of confusion is an inherently factual issue.

**COUNSEL:** For HEALTHNET, INC., plaintiff: Charles L. Woody, Esquire, Clifford F. Kinney, Jr., SPILMAN, THOMAS & BATTLE, Charleston, WV.

For HEALTHNET, INC., plaintiff: W. Mack Webner, Paul M. Higgins, Kevin G. Smith, SUGHRUE MION, Washington, DC.

For HEALTH NET, INC., defendant: Richard J. Bolen, Esquire, Melissa Dodd Veltri, Marvin Chip Capehart, II, HUDDLESTON, BOLEN, BEATTY, PORTER & COPEN, Huntington, WV.

For HEALTH NET, INC., defendant: Rod S. Berman, Elizabeth Barrowman Gibson, Brian W. Kasell, JEFFER, MANGELS, BUTLER & MARMARO, Los Angeles, CA.

For HEALTH NET, INC., counter-claimant: Richard J. Bolen, Esquire, Melissa Dodd Veltri, Marvin Chip Capehart, II, HUDDLESTON, BOLEN, BEATTY, PORTER & COPEN, Huntington, WV.

For HEALTH NET, INC., counter-claimant: Rod S. Berman, Elizabeth Barrowman Gibson, Brian W. Kasell, JEFFER, MANGELS, BUTLER & MARMARO, Los Angeles, CA.

For HEALTHNET, INC., counter-defendant: [*2] Charles L. Woody, Esquire, Clifford F. Kinney, Jr., SPILMAN, THOMAS & BATTLE, Charleston, WV.

For HEALTHNET, INC., counter-defendant: W. Mack Webner, Paul M. Higgins, Kevin G. Smith, SUGHRUE MION, Washington, DC.

**JUDGES:** JOSEPH R. GOODWIN, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** JOSEPH R. GOODWIN

**OPINION**

**MEMORANDUM OPINION AND ORDER**

Pending before the court are the parties' cross-motions for summary judgment concerning the plaintiff's use of the "HealthNet" service mark and the plaintiff's motion for oral argument on these motions. The plaintiff, HealthNet, Inc., filed this action on September 12, 2001, seeking a declaratory judgment that its use of the mark "HealthNet" is not likely to cause confusion and thus does not constitute trademark infringement and/ or unfair competition under the Lanham Act, 15 U.S.C. §§ 1051-1127, as against the defendant's mark "Health Net." The defendant, Health Net, Inc., asserts counterclaims for trademark infringement and for false designation of origin and false impression of association.

The cross-motions for summary judgment concern the ripeness of the plaintiff's request for declaratory relief and the likelihood of confusion [*3] of the respective marks. The court **FINDS** that the plaintiff's declaratory judgment action presents a justiciable case or controversy as required by Article III of the Constitution. The court also **FINDS** that there is a material question of fact as to whether there is a likelihood of confusion between the plaintiff's mark "HealthNet" and the defendant's mark "Health Net." Accordingly, the court **DENIES** the defendant's motion for summary judgment [Docket 40] and **DENIES** the plaintiff's cross-motion for summary judgment [Docket 48]. Furthermore, the court **DENIES as moot** the plaintiff's motion for oral argument on these cross-motions [Docket 63].

**I. Background**

The defendant, Health Net, Inc. (HNT), provides healthcare, healthcare administration, and HMO services. HNT has subsidiaries located in California, Washington, Oregon, New York, Connecticut, New Jersey, and Pennsylvania. HNT's primary subsidiary, Health Net of California (HN-CA), offers various prepaid medical insurance plans (including HMO and PPO products) throughout the state of California. In 1997, HNT acquired an HMO company that also serviced Ohio, Western Pennsylvania, and West [*4] Virginia; however, by February 2001, HNT shut down its HMO services in those states.

HNT is publicly traded on the New York Stock Exchange and has over 3.75 million members with annual revenues exceeding $ 7 billion. HNT has a web site located at www.health.net that provides information about the company and has links to its many subsidiaries, including a link to HN-CA's website, www.healthnet.com. This web site, www.healthnet.com, offers a wide range of health care related education and information to a number of target audiences, including the public at large, brokers and consultants, medical care providers, and its members.

The predecessor-in-interest of HN-CA first used the mark "Health Net" as a service mark and company name in 1978. On February 17, 1981, HN-CA's predecessor-in-interest obtained a federally registered trademark for the "Health Net" mark in connection with "medical and hos-

pitalization insurance underwriting services," under Reg. No. 1,147,331. HNT's federal registration of the mark "Health Net" is still in force and became incontestible on March 17, 1986, pursuant to 15 U.S.C. § 1065.

The plaintiff, HealthNet, Inc. (HealthNet), has used [*5] the mark "HealthNet" as a trade name and trademark in West Virginia since it began operations in June of 1986. HealthNet was formed as a not-for-profit corporation to offer air ambulance services in West Virginia. HealthNet's services are also used by safety and health care officials in Ohio, Pennsylvania, Virginia, Maryland, and Kentucky. The name "HealthNet" appears on the company's helicopters and fixed wing airplanes. HealthNet has a website located at www.healthnetwv.org that provides information concerning HealthNet's air ambulance services.

By letter dated August 11, 1999, HNT advised HealthNet that HealthNet's use of the "HealthNet" mark for air ambulance services was likely to cause confusion with HNT's federally registered "Health Net" mark for medical and hospitalization insurance underwriting services. HealthNet responded by letter dated September 27, 1999, stating that the services of the two companies were distinct and noting that it had separate and valid legal rights in the "HealthNet" name and mark. On December 6, 2000, HNT sent HealthNet another cease and desist letter, to which HealthNet responded by pointing out that it had already answered the assertion in HNT's [*6] previous letter and that it considered the issues resolved and the matter closed.

On May 24, 2001, HNT again wrote HealthNet to announce its nationwide expansion and to state the following:

> Your client's continued use of "HEALTH NET AEROMEDICAL SERVICES" and any other marks or names that incorporate our client's HEALTH NET mark, or any confusingly similar variation thereof, is at your client's own peril. Indeed, if Health Net brings a lawsuit against your client to enforce its rights in the HEALTH NET mark, the courts will consider your client to be a deliberate and willful infringer ... Your client has no reasonable basis why it should not agree to comply with Health Net's requests to cease and permanently refrain from future use of "HEALTH NET AEROMEDICAL SERVICES" and its variations.

(Pl.'s Statement of Undisputed Facts, P 20).

In response, on September 12, 2001, HealthNet filed a complaint in this court for declaratory relief against HNT. Specifically, HealthNet seeks a declaration that its use of the mark "HealthNet" does not constitute infringement or unfair competition against HNT's "Health Net" mark. In addition, HealthNet seeks a declaration that it has superior [*7] rights in the "HealthNet" mark for certain medical services offered in West Virginia and bordering counties. Finally, HealthNet requests injunctive relief concerning the defendant's use of a "confusingly similar" mark in West Virginia and the bordering counties of West Virginia. On December 12, 2001, HNT answered the complaint and therein asserted a counterclaim for infringement and unfair competition.

On August 29, 2002, HNT filed a motion for summary judgment, alleging that the plaintiff's request for declaratory relief is premature because the matter is not ripe for decision on the question of whether a likelihood of confusion exists between the parties' respective use of their marks. HNT also asserts that its incontestible federal trademark registration for the "Health Net" mark gives it the exclusive right to use that mark, in connection with the goods and services recited in the registration, anywhere in the United States. On September 30, 2002, Health Net filed a cross-motion for summary judgment, alleging that the issues in this case are ripe and that there is no likelihood of confusion as a result of the parties' respective use of their marks for different services.

[*8] **II. Standard of Review**

[HN1]To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P.* 56(c). In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). Instead, the court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).

[HN2]Although the court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor." *Anderson,* 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after [*9] adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v.*

*Catrett,* 477 U.S. 317, 322-23, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson,* 477 U.S. at 252.

**III. Discussion**

As previously discussed, this case presents federal claims for trademark infringement and unfair competition. The first issue before the court is whether this case presents an actual case or controversy under the Declaratory Judgment Act, 22 U.S.C. § 2201. The second issue before the court is whether there is a genuine issue of material fact as to whether a likelihood of confusion exists between the parties' respective marks.

**A. Justiciability of Declaratory Judgment Action**

HNT first contends that no declaratory relief can be granted in this case because there is no actual "case or controversy." HNT argues that because the parties do not use their marks in the same geographical area, the matter is not "ripe for decision" on the question of whether a likelihood [*10] of confusion exists between the parties' respective use of their marks. Specifically, HNT asserts that it does not business in West Virginia or the border counties of the surrounding states and that it has no plans to do business in those areas. In response, HealthNet contends that HNT fails to apply the correct law in this case because the action is for declaratory judgment rather than for injunctive relief. HealthNet asserts that the Declaratory Judgment Act applies and that there is a current and real case or controversy between the parties.

**1. Justiciable Case or Controversy**

[HN3]A claim for declaratory judgment, like any other claim, must present a justiciable case or controversy within the meaning of Article III of the Constitution. *See* 28 U.S.C. § 2201(a). The two pronged test for determining whether a case or controversy exists in a declaratory judgment action for trademarks requires a showing that (1) the declaratory claimant has a real and reasonable apprehension of litigation, and (2) the claimant has engaged in a course of conduct which brought it into adversarial conflict with the declaratory defendant. *See* *Maryland Cas. Co. v. Pac. Coal & Oil Co.,* 312 U.S. 270, 273, 85 L. Ed. 826, 61 S. Ct. 510 (1941); [*11] *see also* *Starter Corp v. Converse, Inc.,* 84 F.3d 592, 594 (2d Cir. 1996); *Windsurfing Int'l, Inc. v. AMF, Inc.,* 828 F.2d 755, 757 (Fed. Cir. 1987); *Intel Corp v. CFW Wireless, Inc.,* 2000 U.S. Dist. LEXIS 14280, 2000 WL 1455830, at *1 (W.D. Va. 2000).

As to the first prong, the parties dispute whether HealthNet had a real and reasonable fear of litigation. HNT claims that it did not "directly" threaten suit against HealthNet; rather, it asserts that it "merely advised [HealthNet] that its continued use of 'Healthnet' was at HealthNet's peril." (Def.'s Mem. Supp. Summ. J. at 5). HealthNet, however, points to the fact that HNT sent it three separate cease-and-desist letters maintaining the exact same position-that HealthNet infringed upon HNT's rights. These letters stated a prima facie case for trademark infringement in that they alleged HNT's ownership of a registered mark and HealthNet's use in commerce of a mark so similar to HNT's that it was likely to cause confusion. [1] As the "likelihood of confusion" standard is relevant to infringement proceedings, it was reasonable for HealthNet to infer from HNT's letters a threat of litigation. *See* *Chesebrough-Pond's, Inc. v. Faberge, Inc.,* 666 F.2d 393, 396-97 (9th Cir. 1982); [*12] *Dunn Computer Corp., d/ b/ a* *Steelcloud v. Loudcloud, Inc.,* 133 F. Supp. 2d 823, 828 (E.D. Va. 2001).

1 The letter dated May 24, 2001, from HNT to HealthNet stated the following:

> We are surprised that [HealthNet] is not willing to voluntarily cease use of its mark and agree to refrain from future use of "HEALTH NET AEROMEDICAL SERVICES" and all confusingly similar variations of HNT's HEALTH NET mark. After notifying [HealthNet] of HNT's superior rights and incontestable federal registration, we had hoped to obtain HealthNet's agreement to cease and permanently refrain from adopting, using, or seeking registration with any governmental entity of any trademark ... and/ or Internet domain name that includes the phrase "Health Net" or any variation thereof.
>
> [HNT] has recently announced the nationwide expansion of its HEALTH NET mark. HealthNet's continued use of "HEALTH NET AEROMEDICAL SERVICES" and any other marks or names that incorporate HNT's HEALTH NET mark, or any confusingly similar variation thereof, is at HealthNet's own peril. Indeed, if [HNT] brings a lawsuit against [HealthNet] to enforce its rights in the HEALTH NET marks, the courts will con-

sider your client to be a deliberate and willful infringer.

(Pl.'s Undisputed Fact, P 20).

[*13] Moreover, instead of disclaiming an intent to pursue an infringement action, HNT responded to HealthNet's filing of this declaratory judgment action by including a counterclaim for trademark infringement, dilution, and unfair competition. The actual filing of a counterclaim for infringement, dilution, and unfair competition only strengthens HealthNet's claim that it had a real and reasonable apprehension of litigation. *See* *Chesebrough-Pond's,* 666 F.2d at 396-97; *Dunn Computer Corp.,* 133 F. Supp. 2d at 828; *Progressive Apparel Group, Inc. v. Anheuser-Busch, Inc.,* 1996 U.S. Dist. LEXIS 1292, 1996 WL 50227, at *3 (S.D.N.Y. Feb. 8, 1996). Given HNT's cease-and-desist letters and its decision to file a counterclaim, it is clear that HealthNet had a real and reasonable apprehension of litigation.

[HN4]The second prong requires the court to determine whether HealthNet's conduct has brought it into "actual controversy" with HNT. In other words, the question is whether the facts alleged, under all the circumstances, show that there is a "substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of [*14] a declaratory judgment." *White v. Nat'l Union Fire Ins. Co.,* 913 F.2d 165, 167-68 (4th Cir. 1990) (citing *Maryland Cas. Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 85 L. Ed. 826, 61 S. Ct. 510 (1941)). In this case, HealthNet is currently offering the same services and using the same mark that prompted HNT's cease-and-desist letters. Thus, HealthNet has engaged in conduct that puts it into an adversarial relationship with HNT. *See* *Jeffrey Banks, Ltd. v. Jos. A. Bank Clothiers, Inc.,* 619 F. Supp. 998, 1002 (D. Md. 1985) ("Even in the absence of direct charges of infringement against plaintiff by defendant, an 'actual controversy' can be found if the commercial realities of the situation puts plaintiff in a position where it must run a real risk of potential liability if it goes ahead to exercise what it believes are its legal rights in the commercial market."). Accordingly, the court **FINDS** that this case presents an actual controversy.

**B. Likelihood of Confusion**

[HN5]In a trademark infringement action, the plaintiff must show: (1) that its mark is valid and protected and (2) that the defendant's use of the contested [*15] mark is likely to cause confusion concerning the origin of the goods or services. *See* *Petro Stopping Centers, L.P. v. James River Petroleum, Inc.,* 130 F.3d 88, 91 (4th Cir. 1997); *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.,* 43 F.3d 922, 923 (4th Cir. 1995). [HN6]Because HNT's mark is incontestible, its validity is conclusively presumed. *See* 15 U.S.C. § 1115(b). Therefore, the only matter before the court is whether there is a likelihood of confusion between the marks used by HNT and Health Net.

The Fourth Circuit uses [HN7]a seven-factor test in assessing whether a likelihood of confusion exists: (1) the strength and distinctiveness of the mark; (2) the similarity of the two marks; (3) the similarity of the goods and services that the marks identify; (4) the similarity of the facilities that the two parties use in their businesses; (5) the similarity of the advertising used by the two parties; (6) intent; and (7) actual confusion. *Pizzaria Uno Corp. v. Temple,* 747 F.2d 1522, 1527 (4th Cir 1984). Not all of these factors are of equal relevance in every case. *See id.;* *Sara Lee Corp. v. Kayser-Roth Corp.,* 81 F.3d 455, 463 (4th Cir. 1996); [*16] *Anheuser-Busch, Inc. v. L & L Wings, Inc.,* 962 F.2d 316, 320 (4th Cir. 1992). At the same time, the Fourth Circuit has stated that the seventh factor, actual confusion, is often paramount because "when the plaintiff's mark is strong and the defendant's use of a similar mark 'has actually confused the public, our inquiry ends almost as soon as it begins.'" *Lyons P'ship, L.P. v. Morris Costumes, Inc.,* 243 F.3d 789, 804 (4th Cir. 2001) (citing *Sara Lee Corp.,* 81 F.3d at 467).

The Fourth Circuit has also recognized that [HN8]"likelihood of confusion is an inherently factual issue." *Petro Stopping Centers,* 130 F.3d at 92 (citing *Lone Star Steakhouse,* 43 F.3d at 933). In this case, viewing the facts in the light most favorable to the non-moving party, the question of likelihood of confusion is quintessentially factual in nature. The court **FINDS** that there are several questions of material of fact to be resolved by the factfinder. Accordingly, the court **DENIES** the defendant's motion for summary judgment and **DENIES** the plaintiff's cross-motion for summary judgment.

**IV. Conclusion**

[*17] In accordance with the foregoing discussion, the court **FINDS** that although there is an actual case or controversy between HealthNet and HNT, there are still several questions of material fact to be resolved by the factfinder. Accordingly, the court **DENIES** the defendant's motion for summary judgment and **DENIES** the plaintiff's cross-motion for summary judgment. The court also **DENIES as moot** the plaintiff's motion for oral argument on the summary judgment motions.

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER: January 7, 2003

2003 U.S. Dist. LEXIS 139, *

JOSEPH R. GOODWIN

UNITED STATES DISTRICT JUDGE

Page 19

LEXSEE

Analysis
As of: Jul 27, 2007

**LUMA CORPORATION, Plaintiff v. STRYKER CORPORATION and KARL STORZ ENDOSCOPY-AMERICA, INC., Defendants; KARL STORZ ENDOSCOPY-AMERICA, INC., Plaintiff v. LUMA CORPORATION, Defendant**

**CIVIL ACTION NO. 1:02-1132, CIVIL ACTION NO. 1:02-1479**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**2006 U.S. Dist. LEXIS 50836**

**July 24, 2006, Decided**
**July 24, 2006, Filed**

**SUBSEQUENT HISTORY:** Motion denied by, Claim dismissed by, Request granted Luma Corp. v. Stryker Corp., 2007 U.S. Dist. LEXIS 2316 (S.D. W. Va., Jan. 10, 2007)

**PRIOR HISTORY:** Luma Corp. v. Stryker Corp., 2006 U.S. Dist. LEXIS 7905 (S.D. W. Va., Feb. 3, 2006)

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff patent holder sued two defendants, alleging that they infringed its patent. The first defendant filed a parallel action for a declaratory judgment of non-infringement and invalidity. Before the court were several motions, including the first defendant's motion for partial summary judgment that certain claims were not infringed, and the second defendant's motion for summary judgment that claims 44 and 45 were invalid.

**OVERVIEW:** The court found that defendants' accused products did not infringe the preference database claims (claims 14, 15, 17, 19, 29, 30, 32, and 34). Defendants' accused products did not infringe the preference database claims because none of them had a preference database that stored information about graphical objects to be applied to an output device. A triable issue of fact remained as to whether the defendants' accused products infringed the still frame buffer claims (claims 44 and 45). However, summary judgment was granted to defendants on the still frame buffer claims because the court found that they were invalid. A certain ultrasound imaging system was sold prior to the critical date, and sufficient evidence was presented to establish that the system anticipated each and every element of claim 44, and the patent holder failed to raise a genuine issue of fact to the contrary. Thus, claims 44 and 45 were invalid pursuant to 35 U.S.C.S. § 102(b) for lack of novelty (claim 45 was dependent on claim 44 and therefore was also invalid).

**OUTCOME:** The court granted the first defendant's renewed motion for partial summary judgment that claims 1-13, 16, 18, 20-28, 31, 33, 35-43, and 46-55 were not infringed; the court granted the second defendant's motion for summary judgment that claims 44 and 45 were invalid.

**CORE TERMS:** buffer, frame, database, summary judgment, patent, infringement, infringe, storage, memory, manual, declaration, invalid, output, infringed, graphical, noninfringement, processor, disclose, save, long-term, stored, input, specification, temporary, genuine issue of material fact, prior art, convincing evidence, capability, freeze, drive

**LexisNexis(R) Headnotes**

***Civil Procedure > Summary Judgment > Evidence***
[HN1]The United States Court of Appeals for the Fourth Circuit has held that unsworn statements cannot be considered as evidence at summary judgment. However, declarations signed under penalty of perjury are admissible as affidavits at summary judgment. A number of sis-

ter circuits agree, and many require declarations to comply with the requirements of 28 U.S.C.S. § 1746 or, at a minimum, to include a statement that the declaration is made "under penalty of perjury."

***Governments > Courts > Rule Application & Interpretation***
[HN2]The United States Court of Appeals for the Federal Circuit applies regional circuit law to issues involving interpretation of the Federal Rules of Civil Procedure and the admissibility of evidence.

***Patent Law > Infringement Actions > Claim Interpretation > General Overview***
***Patent Law > Infringement Actions > Infringing Acts > General Overview***
[HN3]Determining whether an accused process or device infringes a patent claim is a two-step process. The first step is determining the meaning and scope of the patent claims asserted to be infringed. The second step is comparing the properly construed claims to the device accused of infringing.

***Patent Law > Infringement Actions > Burdens of Proof***
***Patent Law > Infringement Actions > Summary Judgment > General Overview***
[HN4]Summary judgment is appropriate in a patent case, as in other cases, when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.

***Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants***
***Civil Procedure > Summary Judgment > Burdens of Production & Proof > Scintilla Rule***
[HN5]After the moving party meets its burden of proof on a motion for summary judgment, the burden then shifts to the non-moving party to designate specific facts showing there is a genuine issue for trial. Fed. R. Civ. P. 56(e). To carry this burden, the non-moving party must do more than simply show that there is some metaphysical doubt as to the material facts. The mere existence of a scintilla of evidence will be insufficient; there must be evidence on which the jury could reasonably find for the non-moving party.

***Civil Procedure > Summary Judgment > Standards > Legal Entitlement***
[HN6]Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c).

***Patent Law > Infringement Actions > Burdens of Proof***
[HN7]To establish infringement, the accuser must show by a preponderance of the evidence that every limitation in a claim is present in the accused product, either literally or by equivalent. Thus, non-infringement of a claim may be found if just one element is absent from the accused product.

***Patent Law > Infringement Actions > Infringing Acts > General Overview***
[HN8]A patent claim is literally infringed if the accused product is exactly the same as each element of the asserted claim.

***Patent Law > Infringement Actions > Doctrine of Equivalents > Elements > Equivalence***
[HN9]Even if a product does not literally infringe a patent, it may infringe under the doctrine of equivalents. A claim element is equivalently present in an accused device if only insubstantial differences distinguish the missing claim element from the corresponding aspects of the accused device.

***Patent Law > Claims & Specifications > Claim Language > Dependent Claims***
***Patent Law > Infringement Actions > General Overview***
[HN10]Each dependent claim must contain all the limitations of its associated independent claim. 35 U.S.C.S. § 112; 37 C.F.R. § 1.75. Thus, if an accused product lacks any element in the independent claim, it also lacks an element in the associated dependent claims.

***Constitutional Law > The Judiciary > Case or Controversy > General Overview***
***Evidence > Procedural Considerations > Burdens of Proof > Allocation***
***Patent Law > Jurisdiction & Review > Subject Matter Jurisdiction > Declaratory Judgment Actions***
[HN11]To maintain a declaratory action, a case or controversy must exist throughout proceedings. To establish the existence of a case or controversy, the accused infringer must show (1) that the patentee engaged in con-

duct giving rise to a reasonable apprehension on the accused infringer's part that it will face an infringement suit or the threat of one and (2) that the accused infringer actually produced the accused device. Once a reasonable apprehension of suit is raised, the patentee can remove it by making a covenant to drop previously asserted patent infringement claims. The covenant must be sufficient to estop the patentee from asserting claims in the future. The party seeking a declaratory judgment bears the burden of proving that an actual controversy exists.

***Patent Law > Jurisdiction & Review > Subject Matter Jurisdiction > Declaratory Judgment Actions***
[HN12]The United States Court of Appeals for the Federal Circuit has held that an accused infringer is under a reasonable apprehension of suit when a patentee writes demand letters alleging that the accused corporation's products infringe its patent, and where the patentee disavows the letters but refuses to promise that it would not file an infringement suit against the accused infringer based on the same patent.

***Patent Law > Infringement Actions > Summary Judgment > General Overview***
[HN13]In order to proceed to trial, a patent infringement claimant must produce evidence sufficient to allow a jury to return a verdict for that party. If evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

***Civil Procedure > Summary Judgment > Standards > Legal Entitlement***
[HN14]A movant is entitled to summary judgment when there is an absence of evidence to support the nonmoving party's case.

***Patent Law > Infringement Actions > Defenses > Patent Invalidity > General Overview***
[HN15]A court may elect either to decide validity challenges to non-infringed patent claims on the merits or dismiss them without prejudice.

***Patent Law > Infringement Actions > Burdens of Proof***
***Patent Law > Infringement Actions > Defenses > Patent Invalidity > Validity Presumption***
[HN16]A patent is presumed valid. 35 U.S.C.S. § 282. Each claim is presumed valid independent of the validity of the patent's other claims. The challenger bears the burden to show by clear and convincing evidence that each claim is invalid.

***Patent Law > Infringement Actions > Defenses > Patent Invalidity > Grounds***
[HN17]There are three basic attacks to patent claim validity: lack of novelty, obviousness, and lack of utility.

***Administrative Law > Judicial Review > Standards of Review > General Overview***
***Patent Law > Infringement Actions > Burdens of Proof***
***Patent Law > Infringement Actions > Defenses > Patent Invalidity > Validity Presumption***
[HN18]As to evidence reviewed by the patent examiner, the U.S. Patent and Trademark Office (PTO) is due the deference of a qualified government agency presumed to have properly done its job. However, for evidence not considered by the examiner, the PTO is owed no deference. The burden of proof always remains on the challenger of the validity of a patent and the standard of proof remains that of clear and convincing evidence.

***Patent Law > Anticipation & Novelty > Elements***
***Patent Law > Nonobviousness > Elements & Tests > Prior Art***
[HN19]To be valid, the subject matter of the patent must be new. A product or process is not new if all the claimed elements are disclosed in a single piece of relevant prior art. If this is the case, the prior art is said to "anticipate" the claimed product or process.

***Patent Law > Nonobviousness > Elements & Tests > Prior Art***
[HN20]A product or process may be anticipated by prior publication anywhere or by offer for sale (on-sale bar) in this country before the "critical date," which is one year prior to the effective patent application. 35 U.S.C.S. § 102(b). To show anticipation by prior publication, the reference must disclose the patentee's claimed invention sufficiently to enable one skilled in the art to practice the invention without undue experimentation.

***Patent Law > Infringement Actions > Defenses > Patent Invalidity > Fact & Law Issues***
***Patent Law > Infringement Actions > Defenses > Patent Invalidity > Grounds***
***Patent Law > Nonobviousness > Elements & Tests > Prior Art***
[HN21]To establish invalidity under the on-sale bar, the challenger must show (1) that the product was the subject of a commercial offer for sale in the United States and (2) that it embodies each and every element of the as-

serted claims. 35 U.S.C.S. § 102(b). The court need not make an enablement inquiry under the on-sale bar. The on-sale bar applies to sales pre-dating the critical date by third parties as well as by the patentee. Anticipation in either form is a question of fact.

***Patent Law > Infringement Actions > Defenses > Patent Invalidity > Grounds***
***Patent Law > Nonobviousness > Elements & Tests > General Overview***
[HN22]To be valid, the subject matter of the patent must be non-obvious. Patented subject matter is obvious if the differences between it and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person with ordinary skill in the art. 35 U.S.C.S. § 103(a).

***Evidence > Procedural Considerations > Burdens of Proof > Clear & Convincing Proof***
***Patent Law > Infringement Actions > Defenses > Patent Invalidity > Fact & Law Issues***
***Patent Law > Nonobviousness > Elements & Tests > General Overview***
[HN23]Non-obviousness is a question of law but it is supported by a number of factual determinations, which the challenger must establish by clear and convincing evidence.

***Patent Law > Nonobviousness > Elements & Tests > Hindsight***
[HN24]To avoid the use of hindsight, a court must view the patent claims (1) from the moment just before the invention was made and (2) from the perspective of a person with ordinary skill in the art who does not know the invention.

***Patent Law > Infringement Actions > Defenses > Patent Invalidity > Fact & Law Issues***
***Patent Law > Nonobviousness > Elements & Tests > General Overview***
[HN25]Before the court may determine non-obviousness, the trier of fact must resolve several factual determinations: (1) the scope and content of the prior art, (2) the differences between the prior art and the claims at issue, (3) the level of ordinary skill in the pertinent art, (4) the effect, if any, of certain secondary considerations (mostly economic and motivational), and (5) the extent to which there is a motivation, suggestion, or teaching to modify or combine prior art.

***Patent Law > Infringement Actions > Defenses > Patent Invalidity > Grounds***
***Patent Law > Nonobviousness > Elements & Tests > Prior Art***
[HN26]To invalidate patent claims, relevant art must predate the patent effective filing date by one year. 35 U.S.C.S. § 102(b).

***Patent Law > Infringement Actions > Claim Interpretation > General Overview***
[HN27]It is error for a court to compare in its infringement analysis the accused product or process with the patentee's commercial embodiment or other version of the product or process; the only proper comparison is with the claims of the patent.

**COUNSEL:** [*1] For Luma Corporation, Plaintiff: Amanda M. Fox, PERKINS COIE, Menlo Park, CA; Benjamin T. Duranske, PERKINS COIE, Menlo Park, CA; Jerry J. Cameron, BREWSTER MORHOUS CAMERON, CARUTH MOORE KERSEY & STAFFORD, Bluefield, WV; Lisa Kobialka, PERKINS COIE, Menlo Park, CA; Norbert Stahl, PERKINS COIE, Menlo Park, CA; Paul J. Andre, PERKINS COIE, Menlo Park, CA; Radhika Tandon, PERKINS COIE, Menlo Park, CA; Robert C. Matz, PERKINS COIE, Menlo Park, CA; John H. Shott, JOHN H. SHOTT, Bluefield, WV; Wayne L. Evans, KATZ KANTOR & PERKINS, Bluefield, WV.

For Stryker Corporation, Defendant: Gregory J. Vogler, MCANDREWS HELD & MALLOY, Chicago, IL; John H. Shott, JOHN H. SHOTT, Bluefield, WV; Robert A. Surrette, MCANDREWS HELD & MALLOY, Chicago, IL; Timothy J. Malloy, MCANDREWS HELD & MALLOY, Chicago, IL; Jerry J. Cameron, BREWSTER MORHOUS CAMERON, CARUTH MOORE KERSEY & STAFFORD, Bluefield, WV; Wayne L. Evans, KATZ KANTOR & PERKINS, Bluefield, WV.

For Karl Storz Endoscopy-America, Inc., Defendant: David W. Aldrich, ST. ONGE STEWARD JOHNSTON & REENS, Stamford, CT; Richard J. Basile, ST. ONGE STEWARD JOHNSTON & REENS, Stamford, CT; Wayne L. Evans, KATZ KANTOR & PERKINS, Bluefield, WV; Wesley [*2] W. Whitmyer, Jr., ST. ONGE STEWARD JOHNSTON & REENS, Stamford, CT; Jerry J. Cameron, BREWSTER MORHOUS CAMERON, CARUTH MOORE KERSEY & STAFFORD, Bluefield, WV; John H. Shott, JOHN H. SHOTT, Bluefield, WV.

For Stryker Corporation, Counter Claimant: Gregory J. Vogler, MCANDREWS HELD & MALLOY, Chicago, IL; Robert A. Surrette, MCANDREWS HELD &

MALLOY, Chicago, IL; Timothy J. Malloy, MCANDREWS HELD & MALLOY, Chicago, IL; John H. Shott, JOHN H. SHOTT, Bluefield, WV.

For Luma Corporation, Counter Defendant: Amanda M. Fox, PERKINS COIE, Menlo Park, CA; Benjamin T. Duranske, PERKINS COIE, Menlo Park, CA; Jerry J. Cameron, BREWSTER MORHOUS CAMERON, CARUTH MOORE KERSEY & STAFFORD, Bluefield, WV; Lisa Kobialka, PERKINS COIE, Menlo Park, CA; Norbert Stahl, PERKINS COIE, Menlo Park, CA; Paul J. Andre, PERKINS COIE, Menlo Park, CA; Radhika Tandon, PERKINS COIE, Menlo Park, CA; Robert C. Matz, PERKINS COIE, Menlo Park, CA.

For Karl Storz Endoscopy-America, Inc., Counter Claimant: David W. Aldrich, ST. ONGE STEWARD JOHNSTON & REENS, Stamford, CT; Richard J. Basile, ST. ONGE STEWARD JOHNSTON & REENS, Stamford, CT; Wayne L. Evans, KATZ KANTOR & PERKINS, Bluefield, WV; Wesley W. Whitmyer, [*3] Jr., ST. ONGE STEWARD JOHNSTON & REENS, Stamford, CT.

For Karl Storz Endoscopy-America Inc., Third Party Plaintiff: David W. Aldrich, ST. ONGE STEWARD JOHNSTON & REENS, Stamford, CT; Richard J. Basile, ST. ONGE STEWARD JOHNSTON & REENS, Stamford, CT; Wayne L. Evans, KATZ KANTOR & PERKINS, Bluefield, WV; Wesley W. Whitmyer, Jr., ST. ONGE STEWARD JOHNSTON & REENS, Stamford, CT.

**JUDGES:** David A. Faber, Chief Judge.

**OPINION BY:** David A. Faber

**OPINION**

**MEMORANDUM OPINION**

---

Table of Contents

| | |
|---|---|
| I. | Introduction |
| | |
| II. | Factual Background |
| | |
| III. | Admissibility of Declarations as Evidence |
| | |
| IV. | Infringement |
| | A. Applicable law |
| | B. Analysis |
| | 1. The |
| | 2. Infringement Claims Against Stryker |
| | 3. Infringement Claims Against Karl Storz |
| | 4. Karl Storz's Noninfringement of Claims 1-13, 16, 18, |
| | 20-28, 31, 33,35-43, and 46-55 |
| | |
| V. | Validity |
| | A. Preference Database Claims |
| | B. Still Frame Buffer Claims |
| | 1. Applicable Law |
| | 2. Analysis |
| | |
| VI. | Conclusion |

---

**I. Introduction**

Pending before the court are a number of motions relating to patent infringement and validity: [*4]

(1) Karl Storz Endoscopy-America, Inc.'s ("Karl Storz") motion for leave to file a brief in excess of twenty pages (Doc. No. 450);

(2) Karl Storz's renewed motion for partial summary judgment that Claims 14, 15, 17, 19, 29, 30, 32, 34, 44, and 45 are invalid (Doc. No. 451);

(3) Karl Storz's renewed motion for partial summary judgment that Claims 1-13, 16, 18, 20-28, 31, 33, 35-43, and 46-55 are not infringed (Doc. No. 457);

(4) Karl Storz's renewed motion for partial summary judgment that Claims 14, 15, 17, 19, 29, 30, 32, and 34 are not infringed (Doc. No. 4 62);

(5) Stryker Corporation's ("Stryker") motion for summary judgment that Claims 44 and 45 are invalid (Doc. No. 4 67);

(6) Stryker's motion for summary judgment that Claims 14, 15, 17, 19, 29, 30, 32, 34, 44 and 45 are not infringed (Doc. No. 470);

(7) Luma Corporation's ("Luma") motion for summary judgment as to the validity of Claims 14, 15, 17, 19, 29, 30, 32, 34, 44 and 45 (Doc. No. 475);

(8) Luma's motion for summary judgment of infringement of Claims 14, 15, 17, 19, 29, 30, 32, 34, 44 and 45 against Karl Storz (Doc. No. 479);

(9) Luma's motion for summary judgment of infringement [*5] against Stryker (Doc. No. 482);

(10) Stryker's unopposed motion for leave to file a brief in excess of page limit (Doc. No. 491); and

(11) Karl Storz's motion for leave to file reply in excess of page limit (Doc. No. 515).

Having reviewed the record and applicable law and for the reasons outlined below, the court finds that Stryker and Karl Storz's accused products do not infringe the Preference Database Claims (Claims 14, 15, 17, 19, 29, 30, 32, and 34). A triable issue of fact remains as to whether Stryker and Karl Storz's accused products infringe the Still Frame Buffer Claims (Claims 44 and 45). However, summary judgment is granted to Stryker and Karl Storz on the Still Frame Buffer Claims because the court finds that they are invalid. A case or controversy exists regarding Claims 1-13, 16, 18, 20-28, 31, 33, 35-43, and 46-55, and the court grants summary judgment of noninfringement to Karl Storz as to them because Luma has presented no evidence of their infringement. Accordingly, in a Judgment Order filed herewith, the court orders as follows:

(1) The court GRANTS Karl Storz's motion for leave to file a brief in excess of twenty pages (Doc. No. 450).

(2) [*6] The court GRANTS IN PART and DENIES WITHOUT PREJUDICE IN PART Karl Storz's renewed motion for partial summary judgment that Claims 14, 15, 17, 19, 29, 30, 32, 34, 44 and 45 are invalid (Doc. No. 451). The court finds that Claims 44 and 45 are invalid and GRANTS Karl Storz's motion as to them. As to Claims 14, 15, 17, 19, 29, 30, 32, and 34, the motion is DENIED WITHOUT PREJUDICE because the court finds that Karl Storz did not infringe them.

(3) The court GRANTS Karl Storz's renewed motion for partial summary judgment that Claims 1-13, 16, 18, 20-28, 31, 33, 35-43, and 46-55 are not infringed (Doc. No. 457).

(4) The court GRANTS Karl Storz's renewed motion for partial summary judgment that Claims 14, 15, 17, 19, 29, 30, 32, and 34 are not infringed (Doc. No. 462).

(5) The court GRANTS Stryker's contingent motion for summary judgment that Claims 44 and 45 are invalid (Doc. No. 467).

(6) The court GRANTS Stryker's motion for summary judgment on noninfringement of Claims 14, 15, 17, 19, 29, 30, 32, and 34 (Doc. No. 470).

(7) Luma's motion for summary judgment on validity is DENIED IN PART and DENIED WITHOUT PREJUDICE IN PART. The court DENIES Luma's motion for [*7] summary judgment without prejudice as to the validity of Claims 14, 15, 17, 19, 29, 30, 32, and 34 (Doc. No. 475) because the court finds that those claims were not infringed by either defendant. As to Claims 44 and 45 Luma's motion for summary judgment of validity is DENIED.

(8) The court DENIES Luma's motion for summary judgment of infringement of Claims 14, 15, 17, 19, 29, 30, 32, 34, 44 and 45 against Karl Storz (Doc. No. 479).

(9) The court DENIES Luma's motion for summary judgment of infringement of Claims 14, 15, 17, 19, 29, 30, 32, 34, 44 and 45 against Stryker (Doc. No. 482).

(10) The court GRANTS Stryker's unopposed motion for leave to file a brief in excess of page limit (Doc. No. 4 91); and

(11) The court GRANTS Karl Storz's motion for leave to file a reply in excess of page limit (Doc. No. 515).

**II. Factual Background**

Plaintiff Luma alleges that defendants Karl Storz and Stryker infringed its patent ("'801 Patent"). (See Doc. No. 1, Ex. A, U.S. Patent No. 5,740,801.) The '801 patent covers a system for acquiring, processing, storing, and displaying images during a medical procedure. (Id. Ex. A Col. 1 Ln. 27-38.) For example, during [*8] an endoscopic procedure, a surgeon can use a video camera to capture images of the surgical site. Luma's claimed system displays, stores, and manipulates these images.

In its Complaint for patent infringement, Luma alleges that Karl Storz and Stryker make, use, sell, or import devices which contain all the elements of several of the claims protected by the '801 patent. (Doc. No. 1 P 14.) In response, Stryker and Karl Storz argue that they do not infringe the '801 patent and that it is invalid. (Doc. No. 10 at PP 18-19, 36; Doc. No. 13 P 22.) Stryker and Karl Storz argue that their products do not infringe the '801 patent because they lack at least one element of each asserted claim. Specifically, Stryker and Karl Storz argue that none of their accused products contains a "preference database" or a "still frame buffer" as those terms are used in the '801 patent. (Doc. No. 474 at 2; Doc. No. 507 at 11 & 23.)

Karl Storz filed a parallel action for a declaratory judgment of noninfringement and invalidity against Luma in the Central District of California. After Luma filed its Complaint in this court, Karl Storz's declaratory action was transferred here and consolidated [*9] with Luma's infringement case. (See Doc. No. 142; Civil Action No. 1:02-1479, Doc. No. 1.)

On February 24, 2005, this case was referred to Special Master Paul Beck for interpretation of the disputed patent claim terms. The special master submitted the final report to the court on August 1, 2005 ("Report"). (See Doc. No. 433.) After reviewing the parties' responses to the Report, the court modified and adopted it on February 3, 2006. (See Doc. No. 448.) Simultaneously, the court directed the parties to file motions for summary judgment taking into account the new posture of the case. All three parties submitted motions for summary judgment on patent infringement and validity. Each party also submitted timely responses and replies. Accordingly, the summary judgment motions are ripe for decision.

**III. Admissibility of Declarations as Evidence**

All parties, including Luma, submitted a number of declarations in support of their motions for summary judgment. Karl Storz objects to the admissibility of a declaration by Dr. Edward Shultz (Doc. No. 480) in support of Luma's motion for summary judgment (Doc. No. 479) because it does not satisfy the requirements of an affidavit [*10] under Rule 56 (e) of the Federal Rules of Civil Procedure. (Doc. No. 507.)

[HN1]The Fourth Circuit [1] has held that unsworn statements cannot be considered as evidence at summary judgment. Orsi v. Kirkwood, 999 F.2d 86, 92 (4th Cir. 1993)("It is well established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment."). However, declarations signed under penalty of perjury are admissible as affidavits at summary judgment. Manning v. U.S. Dep't of Justice, 104 Fed. Appx. 907, 909 (4th Cir. 2004)(holding that a declaration made under penalty of perjury raised a genuine issue of material fact); see also Williams v. Sielaff, 914 F.2d 250, 1990 WL 135721, *1 (4th Cir. Sept. 20, 1990)(holding that a declaration made under penalty of perjury qualifies as an affidavit under Rule 56(e) and is admissible at summary judgment). A number of sister circuits agree, and many require declarations to comply with the requirements of 28 U.S.C. § 1746 or, at a minimum, to include a statement that the declaration is made "under penalty of perjury." [2]

1 [HN2]The Federal Circuit applies regional circuit law to issues involving interpretation of the Federal Rules of Civil Procedure and the admissibility of evidence. Biodex Corp. v. Loredan Biomedical, Inc., 946 F.2d 850, 857 (Fed. Cir. 1991)("[O]ur practice has been to defer to regional circuit law when the precise issue involves an interpretation of the Federal Rules of Civil Procedure."); Advanced Cardiovascular Sys. v. Medtronic, Inc., 265 F.3d 1294, 1308 (Fed. Cir.

2001)("Evidentiary rulings . . . are not unique to our jurisdiction and, accordingly, we review them under the law of the [regional circuit].").

[*11]

2 Council of Ins. Agents & Brokers v. Juarbe-Jimenez, 443 F.3d 103, 110 (1st Cir. 2006)(holding that declaration signed under penalty of perjury was admissible at summary judgment); Dale v. Lappin, 376 F.3d 652, 655 (7th Cir. 2004)(holding that declarations signed under penalty of perjury in accordance with § 1746 are admissible at summary judgment as an equivalent to an affidavit); Sterling China Co. v. Glass, Molders, Pottery, Plastics & Allied Workers Local 24, 357 F.3d 546, 557 n.1 (6th Cir. 2004)(same); United States v. Ritchie, 342 F.3d 903, 909 (9th Cir. 2003)(same); United States v. Four Parcels of Real Property in Greene and Tuscaloosa Counties in the State of Alabama, 941 F.2d 1428, 1444 n.36 (11th Cir. 1991)(same); Cianciosi v. Home Depot U.S.A., Inc., 199 F.3d 1321, 1321 (2d Cir 1999)(same); United States v. 225 Cartons, More or Less, of an Article of Drug, 871 F.2d 409, 414 n.4 (3d Cir. 1989)(same).

With its reply, Luma submitted a second declaration by Dr. Edward [*12] Shultz, purporting in the caption to be "sworn." (Doc. No. 509, Shultz Decl.) However, the document satisfies none of the requirements of § 1746 and does not state that it is made "under penalty of perjury." (See id., Shultz Decl.) Luma's reply does not address the subject. (See generally id., Reply.)

Because it is not made under penalty of perjury, the Shultz Declaration in support of Luma's summary judgment motion against Karl Storz (Doc. Nos. 480 & 509) is not admissible. The Shultz Declaration in support of Luma's summary judgment motion against Stryker (Doc. No. 484) and the Johnston Declaration in Support of Luma's opposition to Stryker's motion for summary judgment of invalidity (Doc. No. 497, Attach. 2) suffer the same flaws, and are also inadmissible. As discussed below, the court believes that even if the Shultz and Johnston Declarations were admissible, they would not raise a genuine issue of material fact regarding infringement or validity of the '801 patent.

**IV. Infringement**

**A. Applicable law**

[HN3]Determining whether an accused process or device infringes a patent claim is a two-step process. "The first step is determining the meaning and scope of the [*13] patent claims asserted to be infringed. The second step is comparing the properly construed claims to the device accused of infringing." Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995)(en banc), aff'd 517 U.S. 370, 116 S. Ct. 1384, 134 L. Ed. 2d 577 (1996). The Claim Construction Order (Doc. No. 44 8) covered the first step. This Memorandum Opinion is devoted to the second step.

[HN4]Summary judgment is appropriate in a patent case, as in other cases, when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Nike Inc. v. Wolverine World Wide, Inc., 43 F.3d 644, 646 (Fed. Cir. 1994). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

[HN5]The burden then shifts to the non-moving party to "designate 'specific facts showing there is a genuine issue for trial.'" Id. at 324 (quoting Fed. R. Civ. P. 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical [*14] doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). [HN6]Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

[HN7]To establish infringement, the accuser must show by a preponderance of the evidence that every limitation in a claim is present in the accused product, either literally or by equivalent. See Carroll Touch, Inc., v. Electro Mech. Sys., 15 F.3d 1573, 1576 (Fed. Cir. 1993). Thus, noninfringement of a claim may be found if just one element is absent from the accused product.

[HN8]A claim is literally infringed if the accused product is exactly the same as each element [*15] of the asserted claim. See Hi-Life Prod., Inc. v. Am. Nat'l Water-Mattress Corp., 842 F.2d 323, 325 (Fed. Cir. 1986). [HN9]Even if a product does not literally infringe, it may infringe under the doctrine of equivalents. See Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 25-29, 117 S. Ct. 1040, 137 L. Ed. 2d 146 (1997). "A claim element is equivalently present in an accused device if only 'insubstantial differences' distinguish the missing claim element from the corresponding aspects of the accused device." Sage Prods. v. Devon Indus. 126 F.3d 1420, 1423 (Fed. Cir. 1997).

**B. Analysis**

**1. The '801 Patent**

The '801 patent covers a system for acquiring images during a medical procedure. There are two groups of claims asserted to be infringed in this case. The first group (Claims 14, 15, 17, 19, 29, 30, 32, and 34) requires a preference database and associated processor ("Preference Database Claims"). The second group (Claims 44 and 45) requires a still frame buffer and associated processor ("Still Frame Buffer Claims"). Claims 14, 29, and 44 are independent claims, and the other asserted claims are each dependent on one of them. [3]

3 Claims 15, 17, and 19 are dependent on Claim 14. Claims 30, 32, and 34 are dependent on Claim 29. Claim 45 is dependent on Claim 44. By definition, [HN10]each dependent claim must contain all the limitations of its associated independent claim. 35 U.S.C. § 112; 37 C.F.R. § 1.75. Thus, if the accused product lacks any element in the independent claim, it also lacks an element in the associated dependent claims.

[*16] **a. Preference Database Claims**

All asserted claims require an input device and output device. [4] In addition, the Preference Database Claims require a specific kind of database that contains indications of preferences about graphical objects, and a specific kind of processor that handles database information based on user identity or procedure type. (See Doc. No. 1 Ex. A Col. 48 Ln. 12-37, Claim 14; id. Col. 49 Ln. 19-44, Claim 29.) Claims 14, 15, 17, and 19 apply to preferences pre-stored in relation to user identity and Claims 29, 30, 32, and 34 apply to preferences pre-stored in relation to type of procedure. (See Doc. No. 1 Ex. A Col. 48 Ln. 12-37, Claim 14; id. Col. 49 Ln. 19-44, Claim 29.)

4 Those claim elements are not in dispute in the infringement analysis, but are discussed in greater detail below in the validity analysis.

The claimed "preference database" must pre-store "preference information that indicates one or more visual representations that are preferred to be applied [*17] to said at least one output device . . . visual representations comprising graphical objects." (Doc. No. 1 Ex. A Col. 48 Ln. 23-24, Claim 14; id. Col. 49 Ln. 31-32, Claim 29.) As such, the claim language clearly states that the indications of preferences stored in the preference database must relate to graphical objects to be applied to an output device. [5] Indeed, as this court pointed out at claim construction, limiting the claimed preference information to indications of preferred graphical objects was necessary during patent prosecution to avoid rejection by the patent examiner for anticipation by prior art. (See Doc. No. 448 at 13 n.9)(citing Doc. No. 437 Ex. 3, Patent Application at 104 Ln. 8-10 & Ex. 4, PTO Office Action at 4).

5 In its filings, Luma repeatedly directs the court's attention to selective portions of the patent claims. Luma asks this court to find infringement of the '801 patent by databases in the accused products. Luma assumes that a database with a broad range of content -- information about any sort of preference associated with user identity or procedure type -- is protected by the Preference Database Claims. (Doc. No. 479 at 11-12, 16; Doc. No. 482 at 6-7.) Luma is mistaken. In its Claim Construction Order adopting as modified the special master's report, this court construed "preference database" in context, and found that it simply meant what it said. (Doc. No. 448)(adopting special master's construction found at Doc. No. 437 at 70, 72, 74). Now, Luma attempts to ignore the context of that term, which limits it to preference information about graphical objects.

[*18] **b. Still Frame Buffer Claims**

In addition to an input and output device, the Still Frame Buffer Claims require a method of temporary ("still frame buffer") and long-term ("memory") image data storage. "Still frame buffer" was construed to mean "storage for digital image data for a given period of time." (Doc. No. 435 at 53.) The language of the still frame buffer element limits storage in the still frame buffer to a "temporary" period. (Doc. No. 1 Ex. A Col. 50 Ln. 32-33.) "Memory" was construed to mean "a device for storing information or data." (Doc. No. 435 at 56.) The remainder of the memory element makes clear that the storage in memory must be long-term. (Doc. No. 1 Ex. A Col. 50 Ln. 34-35.)

The Still Frame Buffer Claims are difficult to define because they are vague and the specification provides little guidance about them. As a whole, Claim 44 discloses a two-step process in which the processor freezes an image for a given period of time in the still frame buffer and then saves it to a memory for long-term storage. (See id. Ex. A Fig. 6 & Col. 50 Ln. 33-40.) The specification shows that the freeze-and-save capability of Claim 44 permits a user to save or discard [*19] any frozen image. (Id. Col. 16 Ln. 24-25.) In addition, Figure 6 shows it takes two commands to accomplish this process. (Id. Ex. A Fig. 6.) The claims and specification do not discuss a particular structure as satisfying the requirements of the "still frame buffer" element, but the specification lists "disk storage" as a type of "memory." (Id. Ex. A Col. 2 9 Ln. 5-9.)

**2. Infringement Claims Against Stryker**

Stryker's accused products do not infringe the Preference Database Claims because none of them has a preference database that stores information about graphical objects to be applied to an output device. A triable issue of fact remains as to whether Stryker's SDC Pro/Hermes and SDC Pro 2 systems infringe the Still Frame Buffer Claims. However, the court grants summary judgment to Stryker on those claims because the court finds them to be invalid as discussed in Part V.

**a. Stryker's Hermes System**

Luma argues that Stryker's Hermes system infringes Claims 14 and 15, which require a preference database. (Doc. No. 482 at 5-8.) Luma contends that the voice recognition system found in the Hermes system is a preference database because Luma asserts that it permits [*20] a surgeon to set and store his or her individual preferences for performing an endoscopic procedure. (Id. at 6.) Specifically, Luma states that the surgeon can pre-set preferences for camera settings, light sources, shavers, insufflators, and Stryker's SDC Pro product. (Id.)

The evidence Luma cites does not support its conclusion. Luma cites the Hermes Operating and Maintenance Manual, which states that the voice recognition features of the Hermes system permit a physician to create "voice models" that the Hermes system will use to better recognize vocal commands. (Doc. No. 483 Ex. 11 at STR000710, STR000730-34.) A set of voice models is created during a "voice training session" in which a physician repeats Hermes commands several times. (Id. Ex. 11 at STR000710.) These voice models are saved on a "personal interface card" for future use. (Id.)

Luma points to no evidence that the voice models are used to pre-store indications of preferences about anything, much less preferences about graphical objects. (See id.; Doc. No. 482 at 6-7.) The voice models merely make the conversion of audible commands to electronic signals more accurate and [*21] reliable. (See Doc. No. 471, Hameed Decl. PP 22-24.) The court finds that the voice models are not a preference database. In fact, Luma's position is in disharmony with the specification, which lists voice recognition systems as a type of input device, not a preference database. (Doc. No. 1 Ex. A Col. 6 Ln. 48-49.)

Luma raises no genuine issue of material fact regarding the presence in the Hermes system of a preference database for pre-storing indications of preferred graphical objects to be applied to an output device. Stryker brings sufficient evidence to show that no reasonable jury could conclude that the Hermes system contains a preference database as required in Claims 14 and 15. Accordingly, the court grants summary judgment to

Stryker of noninfringement of Claims 14 and 15 by the Hermes system, and denies Luma's motion for summary judgment on this issue.

**b. Stryker's SDC Pro/Hermes System**

Luma contends that Strker's SDC Pro/Hermes system infringes the Still Frame Buffer Claims. (Doc. No. 482 at 8-10.) Luma argues that the Album Screen feature of Stryker's SDC Pro/Hermes system constitutes a still frame buffer. (Id. at 9; Doc. No. 483 Ex. 13 at [*22] STR000765.) The Album Screen feature of Stryker's system holds only 120 images. (Doc. No. 483 at STR000765.) Luma argues that it is a still frame buffer, storing images for a given period of time, because it must be emptied occasionally to make room for newly acquired images. (Doc. No. 482 at 9.) Stryker responds that the Album Screen is merely a display feature and that the images are stored on a hard drive -- a storage medium Stryker argues is necessarily a form of long-term, not temporary, storage. (Doc. No. 493 at 13.)

The evidence shows that "Album Screen" refers to a storage device or a portion of a storage device. The SDC Pro Manual states that "[a]ll images captured are stored in the Album Screen." (Doc. No. 483 Ex. 13 at STR000765.)(emphasis added). It continues, "[a] maximum of 120 images can be stored in the album. When all 120 images have been captured, the capture button will disable and a warning will appear." (Id.) Stryker's Hameed Declaration is consistent with this evidence. (Doc. No. 471)("Once the capture images are saved to the hard drive, they are stored there and cannot be deleted until (or unless) a new medical procedure is started or [*23] the images are manually moved to another form of long-term storage.").

Stryker's argument rests on the fact that hard drive storage lasts indefinitely and that the specification treats a disk drive as an output device. (Doc. No. 518 at 15-16.) But as Luma points out, the device's image capturing and storing capabilities become useless if the Album Screen remains full. (Doc. No. 494 at 10-11.) Whether the limited capacity of the Album Screen renders it a temporary form of storage is a triable issue of fact. The patent provides too little guidance to define "temporary" as a matter of law. However, as discussed in Part V, summary judgment is granted to Stryker as to the Still Frame Buffer Claims because the court finds that they are invalid.

**c. Stryker's SDC Pro 2 System**

**i. Preference Database Claims**

Luma asserts that Stryker's SDC Pro 2 infringes the Preference Database Claims. (Doc. No. 482 at 11-13.) Luma argues that Stryker's SDC Pro 2 pre-stores preference information about visual representations, including

graphical objects. (Id. at 14)(citing SDC Pro 2 Manual and Shultz Declaration).

The evidence Luma cites does not support its conclusion. The [*24] SDC Pro Manual indicates that the SDC Pro stores surgeons' names and types of procedures. (See Doc. No. 483 Ex. 16 at STR000803-808.) If admissible, Dr. Shultz's declaration would express the opinion that the SDC Pro 2 system "stores information relevant to the use of the medical imaging device in association with medical procedures and practitioners." (Doc. No. 484, Shultz Decl. P 16.) Neither says anything about pre-storing indications of preferences about graphical objects based on user identity or type of procedure. (See also Doc. No. 474 at 11)(citing Doc. No. 472, Atkins Decl. PP 29-33).

The court finds that Luma has failed to raise a genuine issue of material fact as to the presence in Stryker's SDC Pro 2 system of a preference database associating preferences regarding graphical objects to be applied to acquired images with user identity or procedure type. Stryker cites sufficient evidence to show that no reasonable jury could conclude that the SDC Pro 2 contains a preference database as required by the Preference Database Claims. Accordingly, the court grants summary judgment to Stryker of noninfringement of Claims 14, 15, 17, 19, 29, 30, 32, and 34 by [*25] the SDC Pro 2 system, and denies Luma's motion as to that issue.

**ii. Still Frame Buffer Claims**

Luma asserts that Stryker's SDC Pro 2 infringes the Still Frame Buffer Claims. (Doc. No. 482 at 13-15.) Luma raises the same arguments as with the SDC Pro/Hermes system except that the SDC Pro 2 must be emptied after storing 60 images, rather than 120 images. (Id. at 13)(citing Doc. No. 483 Ex. 16, SDC Pro 2 Manual, at STR000822). For the reasons stated above in Part IV.B.2.b, a triable issue of fact remains as to whether the limited storage capacity of the SDC Pro 2 renders its image storage "temporary." However, as discussed in Part V, summary judgment is granted to Stryker as to Claims 44 and 45 because the court finds that they are invalid.

**3. Infringement Claims Against Karl Storz**

Karl Storz's accused products do not infringe the Preference Database Claims because none of them contains a preference database that pre-stores information about graphical objects to be applied to an output device. Luma falls well short of showing that Karl Storz's AIDA and AIDA DVD systems infringe the Still Frame Buffer Claims. A triable issue of fact remains [*26] as to whether Karl Storz's AIDA Compact contains a still frame buffer. However, because the court concludes that the Still Frame Buffer Claims are invalid, it grants summary judgment to Karl Storz as to them.

**a. Karl Storz's SCB System**

Luma alleges that Karl Storz's Communication Bus system ("SCB") infringes all of the Preference Database Claims. (Doc. No. 479 at 9.) Luma argues that because the SCB system can be "configured for particular users and applications" to set up a "working environment," the system has a preference database within the meaning of the Preference Database Claims. (Id. at 10)(citing Matz Decl. Ex. 15, OR1 Instruction Manual at K8019, K8051, K8057). Luma points to the SCB system's capability to pre-program medical devices "to meet the precise needs of each surgeon and/or procedure." (Id. at 11-12)(citing Matz Decl. Ex. 14, OR1 Brochure at K484). If the Shultz Declaration were admissible, it would express the opinion that these features constitute a preference database. (See Doc. No. 509, Shultz Decl. P 7.) This material advanced by Luma is irrelevant because none of it provides evidence about what the Preference Database Claims actually require, [*27] a preference database regarding graphical objects to be applied to an output device.

Luma asserts that Karl Storz's brochure for the OR1 system states that both text and graphical objects are applied to an output device. (Doc. No. 479 at 12)(citing Matz Decl., OR1 Brochure at K483-484). The court cannot find support for that statement in the document cited or elsewhere in the record. But that statement, if proven, would not show infringement of the Preference Database Claims because what is claimed is a preference database of indications of graphical objects to be applied to an output device. (See Doc. No. 1 Ex. A, Claims 14 and 29, Col. 48 Ln. 18-24; see id. Col. 49 Ln. 25-62.) The capability to store preferences in general and also to apply graphical objects in general to an output device is something too broad to find coverage in the '801 patent.

After reviewing the documentary and opinion evidence on the SCB system, the court finds that there is no genuine issue of material fact as to the presence in Karl Storz's SCB system of a preference database. Karl Storz brings sufficient evidence to show that no reasonable jury could conclude that the SCB system contains a preference [*28] database as required by the Preference Database Claims. Accordingly the court grants summary judgment of noninfringement of Claims 14, 15, 17, 19, 29, 30, 32, and 34 by the SCB System, and denies Luma's motion as to that issue.

**b. Karl Storz's AIDA Systems**

The AIDA systems do not infringe the Preference Database Claims because none of them contains a database that pre-stores preferences about graphical objects to be applied to an output device. Luma fails to make a

*prima facie* showing that the AIDA and AIDA DVD systems infringe the Still Frame Buffer Claims. A triable issue of fact remains as to whether the AIDA Compact infringes the Still Frame Buffer Claims. However, the court grants summary judgment to Karl Storz on the Still Frame Buffer Claims because the court finds them to be invalid as discussed in Part V.

**i. Preference Database Claims**

Luma alleges that Karl Storz's Advanced Image and Data Archiving ("AIDA") systems infringe all of the Preference Database Claims. (Doc. No. 479 at 16.) Essentially, the parties dispute whether the AIDA system contains the claimed preference database. Luma argues that the AIDA system's ability to store textual lists of patients, [*29] treatments, images, etc. coupled with its ability to annotate images with text and graphical objects constitutes a preference database. (Id. at 16-17)(citing Doc. No. 481 Ex. 16, AIDA Brochure & Ex. 17, AIDA Instruction Manual).

The evidence Luma cites does not support its conclusion. The AIDA system's information storing and annotating capabilities do not show the existence in the AIDA of the specific kind of preference database required by the Preference Database Claims because they do not indicate that the AIDA device is capable of pre-storing preferences about graphical objects to be applied to an output device. (See Doc. No. 481 Ex. 16, AIDA Brochure & Ex. 17, AIDA Instruction Manual.)

After reviewing the documentary and opinion evidence on the AIDA system, the court finds that there is no genuine issue of material fact as to the presence in Karl Storz's AIDA system of the claimed preference database. Karl Storz brings sufficient evidence to show that no reasonable jury could conclude that the AIDA system contains a preference database as required by the Preference Database Claims. Accordingly, the court grants summary judgment to Karl Storz [*30] of noninfringement of Claims 14, 15, 17, 19, 29, 30, 32, and 34 by the AIDA system, and denies Luma's motion as to that issue.

**ii. Still Frame Buffer Claims**

Luma alleges that Karl Storz's AIDA systems infringe the Preference Database Claims. (Doc. No. 479 at 19). Karl Storz manufactures three AIDA systems. (Doc. No. 481, Matz Decl., Ex. 20, Kern Dep. at 17.) From the parties' presentation, the court has been able to glean the following about them. The AIDA captures still images and can store them to a hard drive or CD. (Id. Matz Decl., Ex. 20, Kern Dep. at 19.) The AIDA DVD captures still images and video and can store them to a hard drive (as a backup), DVD, or CD, but cannot store them to a network. (Id.; Doc. No. 481, Matz Decl., Ex. 19, AIDA DVD Manual at K8196.) The AIDA Compact captures still images and video and can store them on a network or burn them to a CD, but not a DVD. (Id. Matz Decl., Ex. 20, Kern Dep. at 20.) The parties dispute whether the AIDA products contain a still frame buffer.

Luma confusingly presents evidence about all three AIDA systems interchangeably as if they are a single device or set of devices used in combination. However, the devices [*31] are distinct and must be considered separately. In order to establish infringement, Luma must show that a single device or device combination contains all of the elements of at least one claim.

**(1) Karl Storz's AIDA System**

Luma briefly attempts to present evidence that the AIDA system has a still frame buffer. Citing the AIDA Manual, Luma argues that the AIDA system can save images to an external file and toggle between live and still images. (Doc. No. 479 at 20)(citing Doc. No. 481, Matz Decl. Ex. 17, AIDA Manual at K7920). This appears to indicate similarities between the AIDA's capabilities and Claim 45, but neither of these functions suggests the existence of a still frame buffer. In addition, the record references contained in Luma's Proof Chart do not indicate the existence of a still frame buffer. [6] (Doc. No. 481, Matz Decl. Ex. 1 at 8-13.) As such, the court finds that Luma failed to make a *prima facie* showing that the AIDA infringes the Still Frame Buffer Claims, and Luma's motion for summary judgment of infringement is denied as to Claims 44 and 45.

6 The court assumes this is the document Luma ubiquitously cites as "claim chart" and which the Matz Declaration calls a "proof chart." (Doc. No. 481, Matz Decl. Ex. 1.)

[*32] **(2) Karl Storz's AIDA Compact System**

In its brief, Luma argues that the AIDA Compact contains a still frame buffer for temporary storage. (Doc. No. 479 at 20.) Luma states the AIDA Compact freezes images temporarily. As evidence, Luma explains that images must be saved after every ten that are taken and are temporarily stored in the "ring buffer." (Id. at 20)(citing Doc. No. 481, Matz Decl. Ex. 18, AIDA Compact Manual at K8005). The AIDA Compact Manual actually states that image data is stored for up to ten "treatments." (Doc. No. 481, Matz Decl. Ex. 18, AIDA Compact Manual at K8004.) Luma appears to assert that "treatment" means a single image. (See Doc. No. 479 at 20)(stating that "[t]he AIDA allows the capturing of images temporarily, but requires the user to save them after 10 have been taken."). Luma's interpretation is nonsensical. As used in the AIDA Compact Manual, "treatment" means medical procedure. As such, the AIDA Compact is capable of storing images from the previous ten procedures.

In its Proof Chart, Luma cites additional portions of the AIDA Compact Manual as support for its argument that the AIDA Compact contains a still frame buffer [*33] (Doc. No. 481, Matz Decl. Ex. 1, Proof Chart). Luma provides no cogent explanation for how these references support its argument, and the court can find none.

As with Stryker's products, the limited storage capacity of the AIDA Compact may render its "ring buffer" a temporary method of storage even though the images may reside on the storage medium indefinitely. This is a triable issue of fact. Accordingly, the court denies Luma's motion for summary judgment of infringement of Claims 44 and 45 by the AIDA Compact system. However, the court grants summary judgment to Karl Storz as to the Still Frame Buffer Claims because the court finds them to be invalid as stated in Part V.

**(3) Karl Storz's AIDA DVD System**

Luma states that the AIDA DVD allows for long-term storage of images to DVD or CD. (Doc. No. 479 at 20.) Luma argues that this satisfies the "memory" element in Claim 44. In its Proof Chart, Luma cites portions of the AIDA DVD manual discussing its image capturing and image saving capabilities. (Doc. No. 481 Ex. 1 at 8.) The AIDA DVD Manual states that images are saved to a hard drive until they are stored on DVD or CD. (Id. Ex. 19, AIDA DVD Manual at K8196.) [*34] Storage on the hard drive lasts according to the amount of time set for session expiration. (Id.) Images may be recovered until a new session begins. (Id.) Because storage time on the AIDA hard drive is limited to a given period of time (set by the session expiration option), the AIDA DVD contains a still frame buffer. Although the court suspects that the AIDA DVD contains an input and output device, Luma fails to prove it. As such, the court cannot find that Luma met its burden to show that the AIDA DVD infringes the Still Frame Buffer Claims and Luma's motion for summary judgment of infringement on Claims 44 and 45 is denied. However, the court grants summary judgment to Karl Storz as to those claims because the court finds them to be invalid as stated in Part V.

**c. Karl Storz's SCB/AIDA Compact and SCB/AIDA DVD System**

**i. Preference Database Claims**

Luma alleges that Karl Storz's SCB/AIDA Compact or SCB/AIDA DVD systems infringe all of the Preference Database Claims. (Doc. No. 479 at 13.) Luma's argument as to the combined devices is wholly dependent on its arguments as to the constituent devices. As discussed above, the court has already determined that SCB [*35] and AIDA devices have not been shown to infringe the Preference Database Claims. Luma never presents any evidence that the AIDA Compact or AIDA DVD infringes the Preference Database Claims. However, to the extent that Luma argues that the AIDA, AIDA Compact, and AIDA DVD are alike, the court has already rejected Luma's argument that AIDA infringes the Preference Database Claims, as discussed in Part IV.B.3.b.i above.

Luma has failed to establish that the SCB/AIDA Compact and SCB/AIDA DVD infringe the Preference Database Claims. Accordingly, Luma's motion for summary judgment of infringement as to the Preference Database Claims must be denied. Karl Storz has presented evidence that the SCB/AIDA Compact and SCB/AIDA DVD do not contain a preference database and Luma has failed to raise any triable issue of fact to the contrary. As such, Karl Storz's motion for summary judgment of non-infringement as to Claims 14, 15, 17, 19, 29, 30, 32, and 34 is granted.

**ii. Still Frame Buffer Claims**

Luma alleges that Karl Storz's SCB/AIDA Compact or SCB/AIDA DVD systems infringe the Still Frame Buffer Claims. (Doc. No. 479 at 19.) Luma's arguments regarding the combination of these two devices [*36] are wholly dependent on its argument that Karl Storz's AIDA Compact and AIDA DVD systems infringe the Still Frame Buffer Claims. (Id. 13.) For the reasons stated in Part IV.B.3.b.ii above, the court rejected Luma's argument and found that a genuine issue of material fact remains as to whether Karl Storz's AIDA Compact system infringes the Still Frame Buffer Claims. As to the AIDA DVD, the court found that Luma did not show that the device infringed the Still Frame Claims. Accordingly, Luma's arguments about the combination of the AIDA Compact and AIDA DVD device with the SCB device must also fail. Moreover, the court grants summary judgment to Karl Storz as to Claims 44 and 45 because the court finds them to be invalid as stated in Part V.

**4. Karl Storz's Noninfringement of Claims 1-13, 16, 18, 20-28, 31, 33, 35-43, and 46-55**

**a. Case or Controversy**

A case or controversy exists with regard to Claims 1-13, 16, 18, 20-28, 31, 33, 35-43, and 46-55 ("Remaining Claims") because Karl Storz has a reasonable apprehension of being sued by Luma for infringement of them. Karl Storz moves for summary judgment of noninfringement of the Remaining Claims even though [*37] Luma no longer asserts them in this case. (Doc. No. 457.) Karl Storz sued for a declaratory judgment of non-infringement as to all the '801 Patent's claims from the outset. (Civil Action No. 1:02-1479, Doc. No. 1 PP 1, 22-23.) Luma responds that the court cannot rule on infringement of the Remaining Claims because there is no

longer any case or controversy regarding them. (Doc. No. 502 at 3-5.)

[HN11]To maintain a declaratory action, a case or controversy must exist throughout proceedings. Spectronics Corp. v. H.B. Fuller Co. Inc., 940 F.2d 631, 635 (Fed. Cir. 1991). To establish the existence of a case or controversy, the accused infringer must show (1) that the patentee engaged in conduct giving rise to a reasonable apprehension on the accused infringer's part that it will face an infringement suit or the threat of one and (2) that the accused infringer actually produced the accused device. Cordis Corp. v. Medtronic, Inc., 835 F.2d 859, 862 (Fed. Cir. 1987).

Once a reasonable apprehension of suit is raised, the patentee can remove it by making a covenant to drop previously asserted patent infringement claims. Fina Research, S.A. v. Baroid Ltd., 141 F.3d 1479, 1484 (Fed. Cir. 1998). [*38] The covenant must be sufficient to estop the patentee from asserting claims in the future. Id. (citing Super Sack Mfg. Corp. v. Chase Packaging Corp., 57 F.3d 1054, 1059 (Fed. Cir. 1995) and Spectronics, 940 F.2d at 636). The party seeking a declaratory judgment bears the burden of proving that an actual controversy exists. Id. at 1481. There is no dispute in this case that Karl Storz made accused products, so the court focuses on whether Karl Storz is in reasonable apprehension of Luma bringing or threatening to bring an infringement suit on the Remaining Claims.

In Fina Research, [HN12]the Federal Circuit held that an accused infringer was under a reasonable apprehension of suit because the patentee had written demand letters alleging that the accused corporation's products infringed its patent. Fina Research, 141 F.3d at 1482-84. The patentee disavowed the letters but refused to promise that it would not file an infringement suit against the accused infringer based on the same patent. Id. at 1484.

This case is similar. In its Complaint, Luma put all 55 patent claims at issue. (Doc. No. 1 P 14.) [*39] On April 21, 2003, in its first set of interrogatory responses, Luma indicated again that it intended to assert all the claims in the patent. (Doc. No. 453 Ex. C at 4.) Discovery was still proceeding, and it was reasonable for Luma to continue to assert those claims. Later, Luma indicated that it intended to assert only claims 14, 15, 17, 19, 29, 30, 32, 34, 44, and 45. (See Doc. No. 453 Exs. D & E.) However, Luma has rebuffed multiple requests to voluntarily dismiss the Remaining Claims, even though discovery closed long ago on April 9, 2004. (Doc. No. 453 Exs. F, G, H, I, & J.)

Luma's choice to pursue only the ten claims asserted in this action is insufficient to estop it from bringing or threatening to bring an infringement action against Karl Storz on the Remaining Claims as to Karl Storz's current or past products. Like the patentee in Fina Research, Luma refuses to make binding its apparent intention to abandon its infringement case against Karl Storz regarding the Remaining Claims. As such, because Luma remains free to press the Remaining Claims, Karl Storz is under a reasonable apprehension of suit, and a case or controversy regarding them exists. Thus, [*40] this court has jurisdiction to consider Karl Storz's motion for summary judgement of noninfringement of the Remaining Claims.

**b. Noninfringement by Karl Storz of the Remaining Claims**

The court grants Karl Storz's motion for summary judgment of noninfringement as to the Remaining Claims (Doc. No. 457) because Luma has presented no evidence of any infringement of them. [HN13]In order to proceed to trial, a claimant must produce evidence sufficient to allow a jury to return a verdict for that party. Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc., 853 F.2d 1557, 1560 (Fed. Cir. 1988). If evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Id. [HN14]A movant is entitled to summary judgment when there is an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

Luma has never moved for a finding of infringement of the Remaining Claims, and has presented no evidence in response to Karl Storz's motion. (See Doc. No. 502). Luma's argument rests solely on its contention that no case or controversy exists over the Remaining Claims despite its refusal to [*41] unequivocally withdraw them against Karl Storz. Accordingly, the court must grant summary judgment of noninfringement to Karl Storz regarding the Remaining Claims (Claims 1-13, 16, 18, 20-28, 31, 33, 35-43, and 46-55).

**V. Validity**

**A. Preference Database Claims**

As stated in Part IV, this court determined that the Preference Database Claims were not infringed by either defendant. [HN15]This court may elect either to decide validity challenges to noninfringed claims on the merits or dismiss them without prejudice. Liquid Dynamics Corp. v. Vaughan Co., 355 F.3d 1361, 1370-71 (Fed. Cir. 2004); see also Korszun v. Pub. Techs. Multimedia, Inc., 96 F. App'x 699, 700 (Fed. Cir. 2004)(listing four options for disposing of validity challenges to noninfringed patent claims). In its discretion, this court elects to dismiss without prejudice Luma, Stryker, and Karl Storz's motions for summary judgment on the validity of the Preference Database Claims. [7]

7 Stryker's motion for summary judgment of invalidity was contingent on a finding of infringement.

[*42] **B. Still Frame Buffer Claims**

A genuine issue of material fact remains as to whether Stryker's SDC Pro/Hermes and SDC Pro 2 and Karl Storz's AIDA Compact infringe the Still Frame Buffer Claims. As such, the court proceeds to the question of whether the Still Frame Buffer Claims are valid. Stryker argues that the Still Frame Buffer Claims are anticipated by the Ultramark 5 System under the On-Sale Bar rule. (Doc. No. 469 at 5-14.) Karl Storz argues that they are invalid because they disclose merely "freeze-and-capture" technology, which Karl Storz argues was widely known in prior publications, including the Little Patent (U.S. Patent No. 4,922,909). (Doc. No. 452 at 13-21.)

**1. Applicable Law**

[HN16]A patent is presumed valid. 35 U.S.C. § 282. Each claim is presumed valid independent of the validity of the patent's other claims. Id. The challenger bears the burden to show by clear and convincing evidence that each claim is invalid. Oakley, Inc. v. Sunglass Hut Int'l, 316 F.3d 1331, 1339 (Fed. Cir. 2003). [HN17]There are three basic attacks to patent claim validity: lack of novelty, obviousness, and lack of utility. Only obviousness and lack [*43] of novelty are alleged here.

[HN18]As to evidence reviewed by the patent examiner, the U.S. Patent and Trademark Office ("PTO") is due the deference of a qualified government agency presumed to have properly done its job. Am. Hoist & Derrick Co. v. Sowa & Sons, Inc., 725 F.2d 1350, 1359-60 (Fed. Cir. 1984). However, for evidence not considered by the examiner, the PTO is owed no deference. Id. The burden of proof always remains on the challenger and the standard of proof remains that of clear and convincing evidence. Id.

**a. Novelty**

[HN19]To be valid, the subject matter of the patent must be new. A product or process is not new if all the claimed elements are disclosed in a single piece of relevant prior art. Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1335 (Fed. Cir. 2002). If this is the case, the prior art is said to "anticipate" the claimed product or process. ATD Corp. v. Lydall Inc., 159 F.3d 534, 545 (Fed. Cir. 1998).

[HN20]A product or process may be anticipated by prior publication anywhere or by offer for sale ("On-Sale Bar") in this country before the "critical date," which is one year prior to the effective patent [*44] application. 35 U.S.C. § 102(b). To show anticipation by prior publication, the reference must disclose the patentee's claimed invention sufficiently to enable one skilled in the art to practice the invention without undue experimentation. Novo Nordisk Pharm., Inc. v. Bio-Technology Gen. Corp., 424 F.3d 1347, 1355 (Fed. Cir. 2005).

[HN21]To establish invalidity under the On-Sale Bar, the challenger must show (1) that the product was the subject of a commercial offer for sale in the United States and (2) that it embodies each and every element of the asserted claims. 35 U.S.C. § 102(b). The court need not make an enablement inquiry under the On-Sale Bar. In re Epstein, 32 F.3d 1559, 1567-68 (Fed. Cir. 1994). The On-Sale Bar applies to sales pre-dating the critical date by third parties as well as by the patentee. In re Caveney, 761 F.2d 671, 676 (Fed. Cir. 1985). Anticipation in either form is a question of fact. In re McDaniel, 293 F.3d 1379, 1382 (Fed. Cir. 2002).

**b. Obviousness**

[HN22]To be valid, the subject matter of the patent must be nonobvious. Patented subject matter is [*45] obvious if the differences between it and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person with ordinary skill in the art. 35 U.S.C. § 103 (a). [HN23]Nonobviousness is a question of law but it is supported by a number of factual determinations, which the challenger must establish by clear and convincing evidence. SIBIA Neurosciences v. Cadus Pharm., 225 F.3d 1349, 1355 (Fed. Cir. 2000). [HN24]To avoid the use of hindsight, the court must view the patent claims (1) from the moment just before the invention was made and (2) from the perspective of a person with ordinary skill in the art who does not know the invention. W. L. Gore & Assocs., Inc. v. Garlock, Inc., 721 F.2d 1540, 1553 (Fed. Cir. 1983).

[HN25]Before the court may determine nonobviousness, the trier of fact must resolve several factual determinations: (1) the scope and content of the prior art, (2) the differences between the prior art and the claims at issue, (3) the level of ordinary skill in the pertinent art, (4) the effect, if any, of certain secondary considerations (mostly economic and motivational), [*46] and (5) the extent to which there is a motivation, suggestion, or teaching to modify or combine prior art. Graham v. John Deere Co., 383 U.S. 1, 17, 86 S. Ct. 684, 15 L. Ed. 2d 545 (1966)(explaining elements one through four); SIBIA Neurosciences, 225 F.3d at 1356 (applying element five to a single piece of prior art); In re Shaffer, 229 F.2d 476, 479, 43 C.C.P.A. 758, 1956 Dec. Comm'r Pat. 138 (C.C.P.A. 1956)(applying element five to multiple pieces of prior art).

**2. Analysis**

**a. Critical Date**

The earliest possible critical date is March 31, 1992. The patent application that resulted in the '801 patent was a continuation-in-part of an earlier application, which was filed on March 31, 1993. (Doc. No. 1 Ex. A at cover.) [HN26]To invalidate patent claims, relevant art must predate the patent effective filing date by one year. 35 U.S.C. § 102 (b); In re Wertheim, 646 F.2d 527, 533-34 (C.C.P.A. 1981)(holding that the effective patent filing date relates back to previously filed patent applications to the extent that previous applications disclose disputed claims). At most, prior art must predate the critical date of March 31, 1992.

**c. Ultramark 5**

Stryker alleges [*47] that the Ultramark 5 system made by Advanced Technology Laboratories ("ATL") anticipates the Still Frame Buffer Claims because it discloses each and every element of them. The Ultramark 5 is an ultrasound imaging system. (Doc. No. 469 Ex. C at ATL049.) It was sold in January 1989, prior to the critical date. (Id. at 13)(citing id. Ex. F. Harmer Dep. at 13, 16, 19:8-20, 21:14-25, 23:16-24, 25:15-26:3).

Stryker has presented sufficient evidence to establish that the Ultramark 5 (1) is a system for acquiring images during a medical procedure, (2) contains an output device, and (3) contains a memory. (See id. at 5, 6-7, 9-11.) Luma does not appear to dispute these elements. (See Doc. No. 497.) The parties dispute whether the Ultramark 5 contains an input device, a still frame buffer, and the associated processor as those terms are used in the Still Frame Buffer Claims. The court will take each of the elements of the Still Frame Buffer claims in turn.

As discussed below, Stryker has presented clear and convincing evidence that the Ultramark 5 anticipated each and every element of Claim 44, and Luma failed to raise a genuine issue of fact to the contrary. Accordingly, the [*48] court hereby finds that Claims 44 and 45 are invalid pursuant to 35 U.S.C. § 102(b) for lack of novelty. [8]

8 Claim 45 is dependent on Claim 44 and therefore is also invalid. Wolverine World Wide Inc. v. Nike Inc., 38 F.3d 1192, 32 U.S.P.Q.2d 1338, 1342 (Fed. Cir. 1989)(stating that when an independent claim was not infringed, its dependent claims were not infringed as a matter of law).

**i. Input Device**

The court has construed "input device" to mean "a device for generating, obtaining or acquiring an image during a medical procedure." (Doc. No. 433 at 31.) The Ultramark 5 Manual states that the device contains several different types of scanheads and transducers which Rick Dugan of ATL testified obtain images. (Doc. No. 469 Ex. E at 41:10-42:5; Doc. No. 517 at 5-6.) Mr. Dugan is ATL's corporate designee. He was involved in the development of the Ultramark 5, was responsible for reviewing the Ultramark 5 Manual before it was published, and has used the Ultramark 5. (Doc. No. 517 [*49] Ex. M at 5:12-18, 6:4-7:15, 34:5-36:4.)

Luma argues that because the scanheads project sound waves and record their echos, they do not "acquire images" within the meaning of the '801 Patent. (Doc. No. 497 at 8-11.) Luma produces an admissible expert declaration to this effect. (See id. Attach. 3, Hossack Decl. PP 15-16.) Mr. Hossack explains that ultrasound scanheads emit acoustic pulses and receive their echos. (Id. P 15.) A separate device translates that data into a viewable image. (Id. P 16.)

Luma's argument rests largely on the level of abstraction of its viewpoint. Luma demonstrates adequately that the scanhead itself does not convert ultrasonic echos into image data, but the Ultramark 5 Manual makes clear that the system as a whole does convert those echos into images. (See Doc. No. 497, Attach. 3 P 15-16.) As Luma points out, the scanhead accomplishes the first step of the process. Luma has presented no law requiring that a claim element be satisfied by a single part of a prior art system. The fact that ultrasound devices must use multiple devices to acquire sound waves and convert them into images does not detract from the evidence that the Ultramark [*50] 5 actually does perceive sound waves and convert them into images. [9] Moreover, under a reverse infringement analysis, if the Ultramark 5 were an accused device, it would infringe the input device element of the Still Frame Buffer Claims.

9 Indeed, as Mr. Nutter testified at the Markman hearing, a camera, a specified embodiment of an input device, acquires images by receiving light waves and translating them into digital data. (Doc. No. 414 at 122.) Ultrasound devices acquire images by receiving acoustic echos and translating them into digital data. (Id. at 124.) It is not apparent to the court why this distinction makes a difference in this case.

Most persuasive is the fact that the patent specification specifically lists an ultrasound scanner as a type of input device. (Doc. No. 1 Ex. A Col. 6 Ln. 10-19.) Taken together, the Ultramark 5 Manual, Mr. Dugan's testimony, and the specification are clear and convincing evidence that the Ultramark 5 system contains an input device within the meaning of the '801 [*51] Patent.

**ii. Output Device**

This court has construed "output device" to mean "a device for using images obtained by the input device to enable image data to be communicated to a user of the system . . . ." (Doc. No. 433 at 35.) The Ultramark 5 Manual states that the system contains a monitor and Mr. Dugan's testimony establishes that the monitor was used for displaying images acquired by the system. (Doc. No. 469 Ex. C at ATL049; id. Ex. E at 42:7.) Luma does not appear to dispute this evidence. As such, the court finds that Stryker has produced clear and convincing evidence that the Ultramark 5 contains an output device within the meaning of the '801 Patent.

**iii. Still Frame Buffer and Processor**

"Still frame buffer" has been construed to mean "storage for digital image data for a given period of time." (Doc. No. 433 at 53.) Stryker argues that the Ultramark 5's freezing capability ("FRZ" button) allows it to store a frozen image temporarily. (Doc. No. 469 at 7-9.) While an image is frozen, it can be stored, annotated, or measured. Mr. Nutter offers the expert opinion that an image frozen by the Ultramark 5 is stored temporarily. (Doc. No. 468 P 21.)

[*52] Luma argues that the Still Frame Buffer Claims require that an image stored in the still frame buffer remain there until after the procedure is complete to allow the operator an unhurried opportunity to evaluate images and select desirable ones for long-term storage. (Doc. No. 497 at 11-12.) Luma relies on the inventor, Dr. Branson's testimony. (Id.)(citing Doc. No. 414, Markman Hr'g Tr. at 30:19-31:10). This argument is an attempt to add limitations to the still frame buffer element of Claim 44. While Dr. Branson's system marketed by Luma may carry such functionality, Claim 44 does not require "temporary" storage to extend for such a long period of time, and the court will not impose such a limitation now. See Zenith Labs., Inc. v. Bristol-Myers Squibb Co., 19 F.3d 1418, 1423 (Fed. Cir. 1994)[HN27]("[I]t is error for a court to compare in its infringement analysis the accused product or process with the patentee's commercial embodiment or other version of the product or process; the only proper comparison is with the claims of the patent.")

Luma adds that the images are not "stored" when the freeze command is initiated because an image cannot be retrieved once it [*53] is unfrozen. (Doc. No. 497 at 12-13.) Luma relies on an inadmissible expert declaration to this effect from Mr. Johnston. (Id., Attach. 2 P 11.) Even if admissible, the Johnston declaration would merely offer the opinion that an image cannot be retrieved from its frozen state after the image has been unfrozen and that the term "storage" indicates retrieval capability. (Id. Attach. 2 P.) Luma's argument fails because it rests on the assumption that Claim 44 requires temporary storage in the still frame buffer to exceed the duration of a medical procedure, a limitation not found in Claim 44 nor described in the specification.

The Ultramark 5 Manual and Mr. Nutter's expert testimony about it indicate that the Ultramark 5 can store images temporarily while performing certain operations on them, like measurement, annotation, or long-term storage, and can retrieve them until they are unfrozen. This is clear and convincing evidence that the Ultramark 5 discloses a still frame buffer configured for temporary storage.

**iv. Memory**

"Memory" is construed to mean "a device for storing information or data." Stryker argues that the STORE command indicates the presence [*54] of a memory. The STORE command "stores the full-sized ultrasound image and its annotation in the system's memory." (Doc. No. 469 Ex. C at ATL094.) Mr. Nutter provided expert opinion that this feature allows the user to save an image to a memory on a long-term basis. (Doc. No. 468 P 26.) Luma does not appear to dispute this evidence. The court finds that Stryker has presented clear and convincing evidence that the Ultramark 5 discloses a memory for long-term storage.

**v. Processor**

The court construed "processor" to mean "a central processing unit in a computer for processing data and executing a program." (Doc. No. 433 at 47.) Surrounding claim language requires that the processor be capable of receiving a freeze command for temporary storage and a save command for long-term storage. (Doc. No. 1 Ex. A Col. 50 Ln. 36-39.) The Ultramark 5 system's ability to freeze an image temporarily and then save it to a memory indicates the presence of a processor for accomplishing those tasks. (See Doc. No. 469 Ex. C at ATL049, ATL076, & ATL094; Doc. No. 468 P 31-34.) Except to the extent that it disputes the presence of a still frame buffer in the Ultramark 5, [*55] Luma does not appear to dispute this evidence. Stryker has shown clear and convincing evidence that the Ultramark 5 contains a processor.

**b. Little Patent**

Karl Storz argues that the Little Patent [10] (U.S. Patent No. 4,922,909) anticipates the Still Frame Buffer Claims because it discloses each and every element of them, and asks this court to invalidate the Still Frame Buffer Claims pursuant to 35 U.S.C. § 102(b). (Doc. No. 452 at 14)(citing Doc. No. 453, Ex. D, Little Patent). Karl Storz explains how the Little Patent, which was issued on May 8, 1990, discloses a system for freezing

and saving images during a medical procedure. (Id. at 13-21.)

10 When comparing the Little Patent to the '801 Patent to evaluate validity, the court need not defer to the PTO because the patent examiner did not consult the Little Patent before allowing Claims 44 and 45. Am. Hoist & Derrick Co. v. Sowa & Sons, Inc., 725 F.2d 1350, 1359-60 (Fed. Cir. 1984).

Luma does not appear [*56] to dispute that the Little Patent discloses a system with an input device, output device, and memory within the meaning of the '801 Patent. (See Doc. No. 499.) The Little Patent discloses a system using an input device and output device. The Little specification describes a video camera that acquires "highly magnified images," which constitutes an input device. (Doc. No. 453 Ex. D Col. 5 Ln. 21-25.) The Little specification discloses an output device. It describes a monitor apparatus which receives and displays images from a camera and from two image memories. (Id. Ex. D. Col. 5 Ln. 13-14 & 30-34, Col. 6 Ln. 26-29.) The memory disclosed in the Little Patent consists of a hard drive or floppy disk to which the system can store images. (Id. Ex. D Col. 5 Ln. 30-42.)

The heart of the controversy is whether the Little Patent discloses a still frame buffer, its associated processor, and a processor with the image toggling capability disclosed in Claim 45. Karl Storz argues that the "frame grabber" and a separate "buffer memory" in the Little Patent disclose still frame buffers within the meaning of the Still Frame Buffer Claims. (Doc. No. 452 at 17-19.) The Little Patent's frame [*57] grabber digitizes images received from the camera so that they can be seen on a monitor and stored on a hard drive or floppy disk. (Doc. No. 453 Ex. D. Col. 5 Ln. 21-37.) The frame grabber stores them temporarily in "IMAGE 1" and "IMAGE 2" memories. (Id. Ex D. Col. 6 Ln. 6-7)("[T]he real time image is digitized into two image memories (designated 'IMAGE 1' and 'IMAGE 2.'").

The processor can receive a freeze command and digitization of new images stops. (Id. Ex. D Col. 6 Ln. 57 - Col. 7 Ln. 2.) This means that the image on the screen is frozen in IMAGE 1 or IMAGE 2 memory. (Id. Ex. D Col. 7 Ln. 25-29.) As such, the image is frozen in IMAGE 1 or IMAGE 2 temporarily. From there, the image can be saved or discarded. Pressing Fl saves the display memory (IMAGE 1 and IMAGE 2) only, pressing the space bar saves both display memory and buffer, and pressing F2 saves the buffer only. (Id. Ex. D Col. 10 Ln. 33-64.) The evidence shows that the processor in the Little Patent can take the images frozen in IMAGE 1 and IMAGE 2 and save them in long-term memory.

Luma argues that IMAGE 1 and IMAGE 2 do not constitute still frame buffers. Luma attempts to add additional limitations [*58] to the still frame buffer element of Claim 44. Luma argues that Claim 44 discloses a still frame buffer which stores images until a procedure is complete so that the surgeon can decide which images to store long-term after time-sensitive surgery is complete. (Doc. No. 499 at 11.) While Dr. Branson's system marketed by Luma may carry such functionality, Claim 44 does not require "temporary" to extend for such a long period of time, and the court will not impose such a limitation now. See Zenith Labs., Inc. v. Bristol-Myers Squibb Co., 19 F.3d 1418, 1423 (Fed. Cir. 1994).

Luma adds that the images are not "stored" in IMAGE 1 and IMAGE 2 because they cannot be retrieved from those memories once real-time operation is resumed. (Doc. No. 499 at 12, 14-15.) Luma does not argue that images cannot be retrieved from IMAGE 1 and IMAGE 2 at all. Luma merely argues that images cannot be retrieved from those memories after real-time operation is resumed. Again, Luma's argument must be rejected because it rests on the assumption that Claim 44 requires temporary storage in the still frame buffer to exceed the duration of a medical procedure, a limitation not found in the '801 Patent's [*59] claims nor described in the specification. [11] Images can be stored in IMAGE 1 and IMAGE 2 and can be retrieved from there and saved onto a long-term memory before real-time mode is resumed. This is enough to satisfy the processor element of Claim 44.

11 The portion of the specification discussing the '801 Patent's freeze and save capability is vague as to the duration between freezing and saving. As such, it describes both systems that freeze and save during a procedure and systems that can freeze and then save after a procedure. Specifically, the specification states:

> A single button press can take a snapshot of the current information on the screen and transfer it to a memory media as a digital file. This system provides additional logic to allow toggle between "freeze" and "live" until the desired image is frozen. The image can then be saved to memory by executing save command 120. Thus, the surgeon can elect to save or discard any image.

(Doc. No. 1 Ex. A Col. 16 Ln. 18-25.)

As such, Karl [*60] Storz has shown by clear and convincing evidence that IMAGE 1 and IMAGE 2 disclose a still frame buffer within the meaning of the Still Frame Buffer Claims. Karl Storz shows by clear and convincing evidence that the processor disclosed in the Little Patent can freeze images and later save them on a long-term memory. Thus, the Little Patent discloses each and every element of Claim 44, which the court hereby finds to be invalid for lack of novelty pursuant to 35 U.S.C. 102(b). Because Claim 45 is dependent on Claim 44, it too is invalid. Wolverine World Wide Inc. v. Nike Inc., 38 F.3d 1192, 32 U.S.P.Q.2d 1338, 1342 (Fed. Cir. 1989)(stating that when an independent claim was not infringed, its dependent claims were not infringed as a matter of law).

**VI. Conclusion**

For the reasons stated above, the court finds that the Preference Database Claims (Claims 14, 15, 17, 19, 29, 30, 32, and 34) were not infringed. A triable issue of fact remains as to whether the Still Frame Buffer Claims (Claims 44 and 45) were infringed. However, the court finds the Still Frame Buffer Claims to be invalid as anticipated by prior art. Accordingly, summary judgment is granted [*61] to defendants Stryker and Karl Storz.

The Clerk is directed to send copies of this Memorandum Opinion to all counsel of record.

IT IS SO ORDERED this 24th day of July, 2006.

ENTER:

David A. Faber

Chief Judge

LEXSEE

**OBJECTIVE INTERFACE SYSTEMS, Plaintiff v. JOAN GARRETT, Defendant**

**Civil Action No. 1:06cv540**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA, ALEXANDRIA DIVISION**

**2006 U.S. Dist. LEXIS 79722**

**October 27, 2006, Decided**
**October 27, 2006, Filed**

**CORE TERMS:** software, disclosure, misappropriation, factual question, limitations periods, imputed knowledge, judicial notice, statutes of limitations, trade secrets, breach of contract, agency relationship, imputed, equitable estoppel, imputation, disclose, tolling, spring, contract claim, adverse interest, citation omitted, appropriately, diligence, premature, equitable, notice, faulty, memory, helped, licensing agreements, competitor

**COUNSEL:** [*1] For Objective Interface Systems, Inc., Plaintiff: Thomas Kenneth David, David Brody & Dondershine LLP, Reston, VA.

For Joan Garrett, Defendant: William Arthur DeVan, Thelen Reid & Priest LLP, Washington, DC.

**JUDGES:** T.S. Ellis, III, United States District Judge.

**OPINION BY:** T.S. Ellis, III

**OPINION**

**ORDER**

In this diversity action, plaintiff Objective Interface Systems ("OIS") sues a former licensee of its ORB Express software, defendant Joan Garrett, for fraud, misappropriation of trade secrets, and breach of contract. The gravamen of the complaint is that defendant wrongfully provided a copy of the ORB Express software to Vertel, an OIS competitor also named in a related suit pending in California. *See Objective Interface Sytems v. Vertel Corporation,* No. CV-04-2555 (C.D.Cal. filed Aug. 13, 2004).

The matter came before the Court on defendant's motion under Rule 12(b)(6), Fed. R. Civ. P., to dismiss for failure to state a claim. Specifically, defendant argues that the pleadings and other documents properly subject to judicial notice establish as a matter of law that plaintiff's causes of action are barred by the applicable statutes of limitations. [*2] For the reasons that follow, the motion must be denied.

**I.**

[1]

1 As required when considering a motion to dismiss, the facts stated herein are taken from the complaint, the allegations of which are presumed to be true. *Johnson v. Mueller,* 415 F.2d 354, 355 (4th Cir 1969). Additionally, a defendant requests judicial notice under Rule 201(b)(2), Fed. R. Evid., of the contents of a complaint in the related California case, *Objective Interface Systems v. Vertel Corporation,* cited supra. This request, which is appropriately granted, may not convert the motion into one for summary judgment. *See e.g. Witthohn v. Federal Ins. Co.,* 164 Fed. Appx. 395 (4th Cir. 2006) (unpublished per curiam disposition) (judicial notice of state court pleadings appropriate on motion to dismiss).

The complaint alleges that John Singer, a former Vertel employee, began working for plaintiff in April 2001 and revealed to plaintiff at that time that Vertel had obtained [*3] a copy of plaintiff's ORB Express software. This was plaintiff's first notice that its software had been misappropriated by a competitor. Importantly, Singer did not then disclose any details of the misappropriation, and it is not clear from the complaint whether this omission was the result of lack of knowledge, a faulty memory, a sense of self-preservation, or some other cause. According to plaintiff's allegations in the California complaint, in the fall of 2001, Singer disclosed to plaintiff that he had helped Vertel obtain the plaintiff's software in September 1999, and that he had misrepresented himself to plaintiff in the process. [2] Importantly, plaintiff points out that Singer revealed that he

had helped Vertel obtain only a trial version of the software, not the commercial version at issue here. The complaint goes on to allege that Singer disclosed in the summer 2003 that Vertel had obtained a commercial copy of the ORB Express software from a then-unnamed third party. Not until the spring of 2004 did Singer finally disclose that the third party who disclosed the software to Vertel was VBSI, a sole proprietorship owned by defendant. Defendant had negotiated for and ordered [*4] a commercial version of the ORB Express software in November 1999, which she obtained December 2<nd> of that year. At the time, she signed licensing agreements which prohibited, *inter alia,* disclosure of the software to plaintiff's competitors. Defendant obtained an upgrade of the ORB Express software in October 2000. She is alleged to have provided both the original and upgraded versions of the software to Vertel in violation of the licensing agreement shortly after obtaining them. Hence, while defendant allegedly committed the fraud, breach of contract, and misappropriation of trade secrets in 1999 and 2000, plaintiff claims it did not become aware that its software had been misappropriated until 2001, and then did not become aware that defendant was responsible for the misappropriation until 2004.

2 As noted, it is appropriate to take judicial notice of this allegation in the California suit. Defendant seeks judicial notice to argue that the California complaint is inconsistent with the instant complaint insofar as the latter fails to allege Singer's fall 2001 disclosures. It is true that, on a motion to dismiss for failure to state a claim, courts should not accept as true allegations contradicted by matters properly subject to judicial notice, including noticeable pleadings. *See Veney v. Wyche,* 293 F.3d 726, 730 (4th Cir. 2002) (court should not accept as true allegations contradicted by noticeable material). But the principle does not operate here because the California complaint is not inconsistent with plaintiff's complaint in the instant mater, since the California allegations merely supplement the allegations made here.

[*5] On the basis of these allegations, the defendant argues that the limitations periods for all of plaintiff's claims began to run in fall 2001, when Singer made the initial disclosure that Vertel had obtained a copy of the software. Plaintiff, in response, contends that the limitations periods for the fraud and misappropriation claims began to run in spring 2004, when Singer first disclosed that Vertel had obtained plaintiff's software from defendant. The difference is material, since under Virginia law, which the parties correctly agree provides the applicable statutes of limitations and tolling principles, the limitations periods are 2 years for fraud, 3 years for misappropriation of trade secrets, and 5 years for breach of contract. Va. Code §§ 59.1-340 (trade secrets), 8.01-243 (fraud), 8.01-246(2) (simple contracts). In the case of fraud and misappropriation, the action accrues, and the limitations period begins to run, at the earlier of (i) when the fraud or misappropriation was discovered or (ii) when it should have been discovered through the exercise of due diligence. Va. Code §§ 59.1-340, § 8.01-249. *See also STB Marketing Corp. v. Zolfaghari,* 240 Va. 140, 144, 393 S.E.2d 394, 6 Va. Law Rep. 2672 (2003) [*6] (applying due diligence standard). This action was filed May 8, 2006, so if the fraud claim accrued before May 8, 2004, or the trade secret claim accrued before May 8, 2003, the limitations periods have expired on those claims. The analysis proceeds first to the fraud and misappropriation claims, and then to the contract claim.

**II.**

Defendant contends that the California pleadings establish as a matter of law that the claims for fraud and misappropriation of trade secrets are time-barred because Singer's knowledge of the operative facts is appropriately imputed to plaintiff. Specifically, defendant contends (i) that Singer had an agency relationship with plaintiff commencing in April 2001 when he joined plaintiff, (ii) that he knew in fall 2001 the details of defendant's disclosure of the software, and (iii) that he did not have interests adverse to plaintiff's with respect to the disclosure of details about defendant's scheme. If all these propositions are true, then Singer's knowledge of the details of defendant's scheme may appropriately be imputed to plaintiff in the fall of 2001, [3] and plaintiff's claims would therefore be untimely. On the other hand, if any of these propositions [*7] is untrue, imputation cannot occur, with the result that the limitations period would not begin to run until plaintiff had actual knowledge of the disclosure in spring 2004. In this event, the claims would be timely. Because the facts material to defendant's imputation of knowledge argument are either disputed or not yet adequately developed, threshold dismissal on statute of limitations grounds is inappropriate.

3 Under both California and Virginia law, an agent's knowledge is imputed to his principal. *See e.g. Allen Realty v. Holbert,* 227 Va. 441, 446, 318 S.E.2d 592 (1984)("As a general rule, knowledge of an agent is imputed to his principal.")(internal citation omitted); Cal. Civ. Code. § 2332 ("As against a principal, both principal and agent are deemed to have notice of whatever either has notice of, and ought, in good faith and the exercise of ordinary care and diligence, to communicate to the other").

First, "the existence and scope of agency relationships are factual matters." Metco Products v. NLRB, 884 F.2d 156, 159 (4th Cir. 1989). [*8] Defendant claims a factual question exists as to whether disclosure of the relevant details about the scheme to obtain ORB Express was within the scope of Singer's agency. While Singer, once employed by plaintiff, was surely plaintiff's agent, the scope of that agency and whether disclosure of such details was within the scope of his agency are factual questions, requiring further development in discovery; and it would be premature to rule conclusively on them at this stage.

Second, although California law [4] permits imputation of knowledge acquired by an agent before his agency begins, this is permissible only where such knowledge "can reasonably be said to be present in the mind of the agent while acting for the principal." O'Riordan v. Federal Kemper Life Assurance, 36 Cal.4th 281, 288, 30 Cal. Rptr. 3d 507, 114 P.3d 753 (2005). Plaintiff rightly argues that factual questions exist as to Singer's knowledge of the material facts in the fall of 2001, and whether he had a complete or faulty memory of the facts when he made his fall 2001 disclosures. This is significant because if Singer had no recollection of the details of the scheme to disclose ORB Express, there is nothing to impute to plaintiff. [*9] Plaintiff convincingly distinguishes *O'Riordan* on the facts, as in that case the agent became aware of the imputed knowledge immediately before the agency relationship began. In contrast, while the pleadings do not disclose precisely when Singer learned of defendant's involvement, it was at least six months before the fall 2001 disclosure, and possibly up to a year and a half prior to this time. It is not implausible to think that Singer may have forgotten relevant details in the interim. And importantly, as the Restatement notes, whether such a claim of faulty memory is plausible is a factual question:

> [I]f an agent learns a material fact prior to the existence of [an agency relationship], the agent may not be subject to a duty to remember the fact. It is a question of fact whether an agent knows or has reason to know a fact at when the agent takes action and when the fact, if known at that time, would be material to legal consequences for the principal. The nature of the fact and the circumstances under which an agent learned it are relevant to whether the agent may plausibly claim to have forgotten the fact.

*Restatement (Third) of Agency* § 5.03 comment b, illustration 7. [*10] Hence, a question of fact exists as to whether and when Singer first remembered that VBSI and defendant were the third parties through whom Vertel obtained its copy of ORB Express. These factual questions prevent a confident ruling of imputed knowledge at this time.

4 The parties express some uncertainty as to the applicable governing state law on these agency issues. Yet, it currently appears Virginia and California laws do not differ materially on these issues.

Third, the imputed knowledge doctrine may not operate here because plaintiff's allegations in the California pleadings demonstrate that the adverse interest exception to the doctrine may be applicable. Specifically, Singer's fall 2001 disclosures may not have eliminated any adversity between his interests and plaintiff's. Both Virginia and California law recognize the adverse interest exception to the imputed knowledge doctrine. Under Virginia law, "an agent's knowledge will not be imputed to the principal if (1) the agent's behavior [*11] raises a presumption that he would not report the information to the plaintiff or (2) the agent is acting out of a personal motive or interest that is adverse to the principal's interest." *All en Realty Corp v. Holbert,* 227 Va. 441, 446, 318 S.E.2d 592 (1984). Likewise, California law recognizes exceptions to the imputed knowledge doctrine where "the agent and a third party act in collusion against the principal" and where "the agent's action is adverse to the principal." *River Colony Estates General Partnership v. Bayview Financial Trading,* 287 F.Supp.2d 1213, 1227 (S.D.Cal. 2003)(internal citations omitted). Defendant argues that, although Singer's interests may have been adverse to plaintiff's before he revealed that he was involved in the misappropriation, once Singer initially disclosed that he helped obtain ORB Express for Vertel in the fall of 2001, his interests thereafter were no longer adverse to plaintiff's, and thus that the exception is inapplicable.

This argument may carry the day at some later point in this litigation, but it does not do so now. Based on the current record, the adverse interest exception is sufficiently implicated to prevent a conclusive [*12] finding of imputed knowledge. Simply put, this, too, is a factual matter in need of further development. As the plaintiff cogently argues, the California pleadings allege that Singer disclosed that he participated in obtaining *trial* versions of ORB Express, not the commercial version at issue here. That difference may be significant, as it is alleged that the trial software would only operate for a limited time and thus was significantly less valuable. In other words, Singer may have thought it safe to offer this admission so that he might continue to conceal a more serious matter. So, far from supporting defendant's con-

tention that once Singer made the fall 2001 disclosure it was no longer against his interest to divulge further details about the misappropriation of ORB Express, it is apparent that further disclosures may have been contrary to Singer's interests at that time. At least, a factual question exists as to whether further disclosures would have been contrary to Singer's interests, which is sufficient to defeat the motion to dismiss.

In sum, factual questions exist as to the extent and scope an agency relationship between Singer and plaintiff, when Singer remembered [*13] the relevant details, and whether Singer's interests were adverse to the plaintiff's. These disputed factual issues prevent resolution of the imputed knowledge issue in defendant's favor at this stage of the proceedings. Without imputation of knowledge to plaintiff, plaintiff's fraud and misappropriation claims did not accrue until plaintiff actually became aware of defendant's participation in spring 2004. Therefore, defendant's threshold dismissal motion must be denied as to the misappropriation and fraud claims.

**III.**

Plaintiff's breach of contract claim remains to be addressed. Since defendant's alleged breach of the license agreement occurred in late 1999 and fall of 2000, the breach of contract claim is unquestionably filed outside the five year limitations period unless equitable tolling applies. Plaintiff argues equitable tolling is justified because it has pled facts adequate to support fraudulent concealment and/or equitable estoppel, either or both of which toll the statute of limitations. The Fourth Circuit in *Barry v. Donnelly,* 781 F.2d 1040, 1042-43 (4th Cir. 1986)(internal citations omitted), applying Virginia law, stated that "equitable estoppel [*14] occurs where the aggrieved party relies on the words and conduct of the party to be estopped in allowing the limitations period to run." The court also noted that conduct short of fraud may estop a party from asserting the statute of limitations as a defense. *Id.*

Because plaintiff makes a colorable claim of equitable estoppel, it would be premature to rule that the statute of limitations has expired on the contract claim. The conduct said to justify equitable estoppel here is the same as the factual basis for the contract claim, namely, that defendant signed licensing agreements prohibiting disclosure of the software and then covertly provided the software to Vertel. The extent to which plaintiff may justifiably rely on defendant's representations, however, depends on when Singer knew the details of the scheme and when they were disclosed, which are as-yet undeveloped factual questions. Accordingly, these factual questions cannot be resolved at the motion to dismiss stage; it is unclear at this stage whether plaintiff can establish a factual basis for equitable tolling. Accordingly, threshold dismissal of the contract claim is premature.

For these reasons, and for good cause [*15] shown, the motion to dismiss is **DENIED.**

Nothing in this Order is intended to foreclose defendant from raising these issues at the Rule 56 stage on a more fully developed factual record.

It is further **ORDERED** that defendant file her answer to the complaint by 5:00 PM Monday, November 6. The matter will thereafter proceed in accordance with scheduling order issued on September 29, 2006.

The Clerk is directed to send a copy of this Order to all counsel of record.

Alexandria, Virginia

October 27, 2006

T.S. Ellis, III

United States District Judge

LEXSEE

**STAFFING PLUS, INC., Plaintiff, v. TEAM REHAB SERVICES, LLC, et al., Defendants.**

**CIVIL ACTION NO. 05-4242 (MLC)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

**2006 U.S. Dist. LEXIS 519**

**January 5, 2006, Decided**
**January 6, 2006, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff, a Pennsylvania citizen, brought an action against defendants, a New Jersey limited liability company (LLC) and an individual, to recover damages for breach of contract. The court ordered plaintiff to show cause why the complaint should not be dismissed for lack of jurisdiction under 28 U.S.C.S. § 1332.

**OVERVIEW:** Plaintiff alleged that, upon information and belief, there were no shareholders of the LLC who resided in Pennsylvania. The court held that those jurisdictional allegations were insufficient because plaintiff failed to list the LLC members, properly assert the citizenship of each LLC member, or allege the citizenship of the LLC's members in a definite manner. Plaintiff's allegation that "upon information and belief" the individual defendant "resided" in New Jersey was also insufficient because plaintiff failed to assert his citizenship in a definitive manner. The court was concerned that either defendant might be deemed a citizen of Pennsylvania, and thus, plaintiff would not be a "citizen of a different State " in relation to each defendant as required by § 1332(a)(1). Thus, the court advised plaintiff that it intended to dismiss the complaint for lack of jurisdiction unless plaintiff provided a list specifically naming each LLC member and properly alleged the citizenship of each, properly alleged the individual defendant's citizenship, and demonstrated jurisdiction under § 1332. Plaintiff failed to respond to the show cause order, so the court dismissed the complaint.

**OUTCOME:** The court granted the order to show cause why the action should not be dismissed for lack of jurisdiction, dismissed the complaint for lack of jurisdiction under § 1332, without prejudice to plaintiff to re-commence the action in an appropriate state court; and granted leave to plaintiff to re-commence the action in an appropriate state court.

**CORE TERMS:** citizenship, diversity, place of business, jurisdictional, re-commence, inter alia, unincorporated, shareholders, unsupported, membership, reside, layer, definitive

**LexisNexis(R) Headnotes**

***Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss***
[HN1]Fed. R. Civ. P. 12(h)(3) states that a court shall dismiss a complaint if jurisdiction appears lacking.

***Business & Corporate Law > Limited Liability Companies > General Overview***
***Civil Procedure > Jurisdiction > Diversity Jurisdiction > Citizenship > Business Entities***
[HN2]Limited liability companies, as opposed to corporations, are (1) unincorporated associations, and (2) deemed citizens of each state in which their members are citizens, not the states in which they were formed or have their principal places of business.

***Business & Corporate Law > Limited Liability Companies > General Overview***
***Civil Procedure > Jurisdiction > Diversity Jurisdiction > Citizenship > Business Entities***
[HN3]For diversity jurisdiction, the citizenship of limited liability companies formed under the New Jersey Limited Liability Company Act is the citizenship of its entire membership. Each membership layer of a limited liability company must be analyzed to determine its citizenship.

***Business & Corporate Law > Limited Liability Companies > General Overview***
***Civil Procedure > Jurisdiction > Diversity Jurisdiction > Citizenship > Business Entities***
[HN4]The citizenship of unincorporated association must be traced through however many layers of members there may be.

***Civil Procedure > Jurisdiction > Diversity Jurisdiction > Citizenship > General Overview***
***Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements***
[HN5]Allegations on where a person or an entity resides, is domiciled, is licensed, or has a place of business -- as opposed to is a citizen -- will not properly invoke a federal district court's jurisdiction when premised upon diversity of citizenship.

***Civil Procedure > Jurisdiction > Diversity Jurisdiction > Citizenship > General Overview***
***Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements***
[HN6]Citizenship allegations that are "upon information and belief," or not specific (e.g., citizen of a "state other than Pennsylvania"), are not sufficient.

***Civil Procedure > Jurisdiction > Diversity Jurisdiction > Citizenship > General Overview***
***Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements***
[HN7]Stating a citizenship allegation that is "upon information and belief" is insufficient.

***Civil Procedure > Jurisdiction > Diversity Jurisdiction > Citizenship > General Overview***
***Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements***
[HN8]An allegation that no plaintiff is from same state as any defendant is insufficient to prove diversity jurisdiction absent an averment of particular states of which parties are citizens.

***Civil Procedure > Jurisdiction > Diversity Jurisdiction > Citizenship > General Overview***
***Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements***
[HN9]An "upon information and belief" citizenship allegation does not convince the court that there is diversity among the parties.

***Civil Procedure > Jurisdiction > General Overview***
***Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements***
[HN10]A jurisdictional challenge is measured against the state of facts that existed at the time of filing -- whether the challenge be brought shortly after filing, after the trial, or even for the first time on appeal.

***Civil Procedure > Jurisdiction > General Overview***
[HN11]A plaintiff should ascertain jurisdiction before it chooses to bring an action in federal court, rather than in state court.

***Civil Procedure > Jurisdiction > General Overview***
***Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements***
[HN12]An unsupported 28 U.S.C.S. § 1332 jurisdiction allegation may violate Fed. R. Civ. P. 11.

***Civil Procedure > Jurisdiction > Diversity Jurisdiction > General Overview***
***Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements***
[HN13]When a party is represented by counsel, the court should not need to underscore the importance of adequately pleading and proving diversity.

***Governments > Legislation > Statutes of Limitations > Tolling***
[HN14]The limitations period for state causes of action is tolled by the filing of a federal complaint.

**COUNSEL:** [*1] For STAFFING PLUS, INC., Plaintiff: RACHEL VOLKMAN, DILWORTH PAXSON LLP, CHERRY HILL, NJ.

**JUDGES:** MARY L. COOPER, United States District Judge.

**OPINION BY:** MARY L. COOPER

**OPINION**

**MEMORANDUM OPINION**

**THE COURT** ordered the plaintiff to show cause why the complaint should not be dismissed for lack of

jurisdiction under 28 U.S.C. § ("Section") 1332. (Dkt. entry no. 2.) The plaintiff -- Staffing Plus, Inc. ("SPI"), a Pennsylvania citizen -- (1) brought this action on August 26, 2005, *inter alia,* to recover damages for breach of contract, (2) asserts jurisdiction under Section 1332 (*see* Compl., at 1-2), and (3) bears the burden of demonstrating jurisdiction. *See* *McCracken v. Murphy,* 129 Fed. Appx. 701, 2005 WL 995510, at *1 (3d Cir. 2005). The Court examined jurisdiction *sua sponte. See* [HN1]Fed.R.Civ.P. 12(h)(3) (stating court shall dismiss complaint if jurisdiction appears lacking).

### I. TEAM REHAB SERVICES, LLC

SPI alleges the defendant Team Rehab Services, LLC ("TRS"), is "a New Jersey limited liability company, with its principal place of business [in] New Jersey," and "upon information and belief, there are [*2] no shareholders of [TRS] who reside in Pennsylvania." (Compl., at 2.) These jurisdictional allegations are insufficient.

### A. Members Of Limited Liability Companies

SPI fails to list the members, as opposed to "shareholders," of TRS. [HN2]Limited liability *companies,* as opposed to *corporations,* are (1) unincorporated associations, and (2) deemed citizens of each state in which their members are citizens, not the states in which they were formed or have their principal places of business. *Carden v. Arkoma Assoc.,* 494 U.S. 185, 195-97, 110 S. Ct. 1015, 108 L. Ed. 2d 157 (1990); *Kalian at Poconos v. Saw Creek Ests. Cmty. Ass'n,* 275 F.Supp.2d 578, 586 (M.D. Pa. 2003); *see* *Ferrara Bakery & Cafe v. Colavita Pasta & Olive Oil Corp.,* 1999 U.S. Dist. LEXIS 2872, No. 98-4344, 1999 WL 135234, at *2 (S.D.N.Y. Mar. 12, 1999) (stating [HN3]for "diversity jurisdiction, the citizenship of LLCs formed under the [New Jersey Limited Liability Company Act] is the citizenship of its entire membership"). Also, each membership layer of a limited liability company must be analyzed to determine its citizenship. *Belleville Catering Co. v. Champaign Mkt. Place,* 350 F.3d 691, 693 (7th Cir. 2003) [*3] (concerning limited-liability-company member, which was itself a limited liability company); *Hart v. Terminex Int'l,* 336 F.3d 541, 543 (7th Cir. 2003) (stating [HN4]citizenship of unincorporated association must be traced through however many layers of members there may be).

### B. Citizenship Allegation

SPI fails to properly assert the citizenship -- as opposed to "residence" -- of each TRS member. [HN5]Allegations on where a person or an entity resides, is domiciled, is licensed, or has a place of business -- as opposed to is a citizen -- "[will] not properly invoke this Court's jurisdiction when premised upon diversity of citizenship." *Forman v. BRI Corp.,* 532 F.Supp. 49, 51 (E.D. Pa. 1982); *see* *Guerrino v. Ohio Cas. Ins. Co.,* 423 F.2d 419, 421 (3d Cir. 1970).

### C. Definitive Allegation

SPI fails to allege the citizenship of TRS's members in a definite manner, as opposed to "upon information and belief." [HN6]Allegations that are "upon information and belief," or not specific (*e.g.,* citizen of "state other than Pennsylvania"), are not sufficient. *See* *Lewis v. Consol. Freightways Corp.,* 2005 U.S. Dist. LEXIS 3248, No. 04-6102, 2005 WL 503317, at *1 (E.D. Pa. Feb. 28, 2005) [HN7] [*4] (stating citizenship allegation that is "upon information and belief" is insufficient); *Poling v. Hovnanian Enters.,* 99 F.Supp.2d 502, 516 (D.N.J. 2000) (granting motion to dismiss for lack of jurisdiction since, *inter alia,* [HN8]allegation that "no plaintiff is from same state as any defendant" insufficient absent averment of particular states of which parties are citizens), *appeal dismissed,* 32 Fed. Appx. 32, 2002 WL 521705 (3d Cir. 2002); *Vail v. Doe,* 39 F.Supp.2d 477, 477 (D.N.J. 1999) (stating [HN9]"upon information and belief" citizenship allegation "does not convince the Court that there is diversity among the parties").

### II. JAY S. ZIMMET

SPI alleges that "upon information and belief" the defendant Jay S. Zimmet "resid[es]" in New Jersey. (Compl., at 2.) This jurisdictional allegation is insufficient. SPI fails to assert Zimmet's citizenship -- as opposed to residence -- in a definitive manner. *See* Parts I.B & I.C, *supra.*

### III. AVOIDING DISMISSAL

The Court was concerned that either TRS or Zimmet would be deemed a citizen of, among other states, Pennsylvania, [*5] and thus SPI would not be a "citizen[] of [a] different State[]" in relation to each defendant. 28 U.S.C. § 1332(a) (1). [HN10]A jurisdictional challenge is measured "against the state of facts that existed at the time of filing -- whether the challenge be brought shortly after filing, after the trial, or even for the first time on appeal." *Grupo Dataflux v. Atlas Global Group,* 541 U.S. 567, 571, 124 S. Ct. 1920, 158 L. Ed. 2d 866 (2004). Thus, SPI was advised that the Court intended to dismiss the complaint for lack of jurisdiction under Section 1332 unless SPI (1) provided a list specifically naming each member of TRS, and properly alleged the citizenship of each member, as of August 26, 2005, (2) properly alleged Zimmet's citizenship as of August 26, 2005, and (3) demonstrated jurisdiction under Section 1332. (10-27-05 Order to Show Cause.)

SPI was advised that a failure to strictly abide by the Court's directives, or an application for discovery or time to discern jurisdiction, would result in the complaint's dismissal. (*Id.*) [HN11]SPI should have ascertained jurisdiction before it chose to bring an action in federal court, rather than in state court. *See* *Techstar Inv. Partn. v. Lawson,* 1995 U.S. Dist. LEXIS 18424, No. 94-6279, 1995 WL 739701, at *4 (E.D. Pa. Dec. 8, 1995) [*6] (stating [HN12]unsupported Section-1332-jurisdiction allegation may violate Federal Rule of Civil Procedure 11); *see also* *Cohen v. Kurtzman,* 45 F.Supp.2d 423, 436-38 (D.N.J. 1999) (granting Rule 11 motion for unsupported jurisdiction allegation); *Hussey Copper v. Oxford Fin. Group,* 121 F.R.D. 252, 253-54 (W.D. Pa. 1987) (same). [HN13]When a party is represented by counsel, the Court "should not need to underscore the importance of adequately pleading and proving diversity." *CGB Occ. Therapy v. RHA Health Servs.,* 357 F.3d 375, 382 n.6 (3d Cir. 2004).

But SPI was advised further that a dismissal here would be without prejudice to re-commence the action in state court, as [HN14]the limitations period for the causes of action is tolled by the filing of the federal complaint. *See* *Young v. Clantech, Inc.,* 863 F.2d 300, 301 (3d Cir. 1988); *Galligan v. Westfield Ctr. Serv.,* 82 N.J. 188, 191-95, 412 A.2d 122 (1980).

The order to show cause was returnable on December 14, 2005. (10-27-05 Order to Show Cause.) SPI has failed to respond. Thus, the Court intends to dismiss [*7] the complaint for lack of jurisdiction under Section 1332. The Court will issue an appropriate order and judgment.

5 JAN 06

**MARY L. COOPER**

United States District Judge

**ORDER & JUDGMENT**

For the reasons stated in the Court's memorandum opinion, **IT IS** on this 5th day of January, 2006, **ORDERED** that the Court's order to show cause why the action should not be dismissed for lack of jurisdiction under 28 U.S.C. § 1332 (dkt. entry no. 2) is **GRANTED;** and

**IT IS FURTHER ADJUDGED** that the complaint is **DISMISSED** for lack of jurisdiction under Section 1332, **WITHOUT PREJUDICE** to the plaintiff to re-commence the action in an appropriate state court; and

**IT IS FURTHER ORDERED** that the plaintiff is **GRANTED LEAVE** to re-commence the action in an appropriate state court by **JANUARY 20, 2006;** and

**IT IS FURTHER ORDERED** that the Clerk of the Court designate the action as **CLOSED.**

**MARY L. COOPER**

United States District Judge